DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Williams County Court of Common Pleas, following a trial to the court, in which appellant was found guilty of safecracking, in violation of R.C. 2911.31(A), a fourth degree felony, and theft from an elderly person, in violation of R.C. 2913.02(A)(1) and (B)(3), a third degree felony, and was sentenced to serve concurrent prison terms of one and four years, respectively.
 {¶ 2} On appeal appellant, Clyde L. Tressler, sets forth the following five assignments of error:
 {¶ 3} "Assignment of error number one
 {¶ 4} "The circumstantial evidence presented was not sufficient to support a finding of guilt since each and every element of both counts of the indictment were [sic] not established beyond a reasonable doubt.
 {¶ 5} "Assignment of error number two
 {¶ 6} "The trial court's finding of guilt on both counts of the indictment was against the manifest [weight] of the evidence.
 {¶ 7} "Assignment of error number three
 {¶ 8} "Impermissible inferences drawn solely upon other inferences were relied upon by the court in reaching its finding of guilt on both counts of the indictment.
 {¶ 9} "Assignment of error number four
 {¶ 10} "The trial court's sentence imposed on the guilty finding against the appellant for a violation of O.R.C. § 2913.02 (theft from an elderly person — a felony of the third degree) was contrary to law since the court did not comply with the purposes and principles of Ohio's sentencing guidelines set forth in O.R.C. § 2929.11 through § 2929.15.
 {¶ 11} "Assignment of error number five
 {¶ 12} "The trial court erred when sentencing the appellant for the conviction on `safe cracking' (a felony of the fourth degree) when it failed, as required pursuant to O.R.C. § 2929.13, to make specific findings of fact in support of a prison term sentence."
 {¶ 13} On February 14, 2001, 75 year old Clayton Moreland, a widower with no children, was admitted to the hospital in Bryan, Ohio, due to complications arising from cancer. Clayton was taken to the hospital by appellant, who is Clayton's nephew, and appellant's mother, Mildred Tressler, who is Clayton's sister. After he was admitted to the hospital, Clayton gave appellant the key to his home in Montpelier, Ohio, so that appellant could care for Clayton's three dogs during his hospital stay.
 {¶ 14} On February 21, 2001, appellant told Clayton that the back door to Clayton's house was open and unlocked when appellant arrived that morning to feed the dogs. Clayton asked appellant to return the house key, which appellant did. Later, Clayton's stepson, Donald Andrews, went to Clayton's house, and confirmed that the back door was still open and unlocked. Andrews shut and locked the door without going into the house.
 {¶ 15} That same day, appellant went to Jim Schmidt's Chevrolet dealership in Hicksville, Ohio, and purchased a 1998 Chevy S-10 pickup truck for $13,284. Appellant paid for his purchase in cash, with 133 $100 bills. The next day, appellant met with Barbara Thomas, a loan officer at the National Bank of Montpelier, to ask for a loan to purchase a truck. Appellant filled out a loan application and was given an unsecured 30-day note in the amount of $12,000, the proceeds of which were deposited in his checking account. On March 7, 2001, a loan and real estate mortgage on appellant's house were closed, for a total of $16,200. Appellant paid off the 30-day note with the loan proceeds.
 {¶ 16} The same day that appellant applied for a loan, Andrews and his wife, Doris, went back to Clayton's house, with Clayton's house key. Upon inspecting the house, the couple noticed that a safe, which they believed contained money and other effects belonging to Clayton, was missing from the spare bedroom. They reported the missing safe to Montpelier police, who began an investigation.
 {¶ 17} On February 26, 2001, Sergeant John Rowe of the Steuben County, Indiana Sheriff's Department notified Montpelier police that a safe had been found near Angola, Indiana, on top of an icy pond near an I-69 overpass. The door of the safe had been pried off and was laying nearby. Documents found around and in the safe bore Clayton Moreland's name. No money was found. Although the safe was dusted for fingerprints, no identifiable prints could be obtained from the safe or any of the materials that were recovered along with it.
 {¶ 18} Clayton Moreland died on March 27, 2001. The sole beneficiary of Clayton's estate was his stepgrandson, Larry Andrews, an ordained minister from Arizona, whom Clayton and his late wife had raised. At the time of his death, Clayton's estate was valued at $84,110.58, not including any valuables that may have been in the safe.
 {¶ 19} On July 18, 2001, a Williams County Grand Jury indicted appellant on one count of safecracking, in violation of R.C. 2911.31(A), a fourth degree felony, and one count of theft from an elderly person of an amount in excess of $100,000, in violation of R.C. 2913.02(A)(1) 
(B)(3), a second degree felony. On August 1, 2001, appellant entered a plea of not guilty and, on January 2, 2002, appellant waived his right to a jury trial and elected to be tried by the court.
 {¶ 20} On January 14, 15, and 16, 2002, a trial to the court was held at which testimony was presented by Lieutenant Tim Livengood of the Montpelier Police Department, Detective John Rowe of the Steuben County, Indiana Sheriff's Department, Cindy Castor, branch manager of the First Federal Bank in Bryan, Ohio, Donald Andrews, Larry Andrews, Debra Knepper, RN, Nicholas Karris and Rudy Straley of Jim Schmidt's Chevrolet, Barbara Thomas and Rex Miller from National Bank of Montpelier, and Mildred Tressler.
 {¶ 21} Lieutenant Livengood testified at trial that he went to Clayton Moreland's home on February 22, 2001, after Donald Andrews reported a break in; however, he saw no sign of forced entry. On cross-examination, Livengood testified that Donald and Doris Andrews told him that, although they did not regularly visit Clayton Moreland, they were aware of a safe in the spare bedroom. Livengood further testified that other items on the dresser on which the safe was kept were not disturbed, leading him to conclude that the 80 — 100 pound safe must have been "lifted off" the dresser. Livengood stated that Larry Andrews told him the safe contained approximately $100,000 in July 1999. Livengood also stated that Larry gave him the names of several individuals who may have been involved in safe's disappearance. He was, however, unable to contact anyone other than appellant and Donald, Doris and Larry Andrews. Livengood further stated that, to his knowledge, appellant had the only key to Clayton's house at the time the safe disappeared.
 {¶ 22} In conjunction with Livengood's trial testimony, the prosecution entered into evidence a recording in which Livengood is heard interviewing appellant on April 23, 2001. In the recorded interview, appellant told Livengood that he and his mother often helped Clayton buy groceries and medicine, and sometimes they took Clayton out to eat. Appellant characterized Clayton as "gay," "forgetful," and "thrifty." Appellant stated that he had no idea whether Clayton had any money in his home.
 {¶ 23} Appellant further stated in the interview that he receives social security disability payments due to his bad back, in the amount of $1,084 per month, and that his mother, who receives $514 per month in social security benefits, lives with him and shares some of his household expenses. Appellant told Livengood during the interview that, after paying for groceries, utilities and other expenses, "there really ain't a whole lot of money we have left."
 {¶ 24} Early in the interview, appellant told Livengood that he bought the S-10 pickup truck with a bank loan. However, appellant later told Livengood that he paid for the truck in cash after he won $20,000 in the lottery, by purchasing $40 worth of tickets and playing the number "283" on all of them. When Livengood confronted appellant with the fact that he did not apply for a loan until the day after the truck was purchased, and the number "283" was not chosen in the lottery until February 24, appellant changed his story and told Livengood that he used money from his savings to buy the truck. Appellant then told Livengood that he took out the bank loan so he would have money to "fall back on" after he exhausted his savings.
 {¶ 25} Sergeant John Rowe testified at trial that when he found the safe near the I-69 overpass, the door was off and laying nearby, along with a metal box, some documents, a checkbook, and several pieces of jewelry. Rose further testified that Clayton Moreland's name was on some of the papers. He stated that it was impossible to tell how long the safe had been on the ice.
 {¶ 26} Cindy Castor testified that Clayton Moreland had withdrawn $25,000 in cash from his savings account on July 2, 1999, and another $50,000 in cash on July 9, 1999. Castor further testified that Clayton's account was closed on February 26, 2001, when Larry Andrews withdrew the remaining balance of $34,691.08 and put it in Clayton's checking account. Castor stated that Clayton made one other large withdrawal, on November 2, 1998, when he purchased a cashier's check in the amount of $21,056.
 {¶ 27} Donald Andrews testified at trial that he went to Clayton's house on February 21, 2001, because he heard that someone had broken in. Donald further testified that, when he arrived, the back door was open and unlocked. Donald stated that, after talking to Clayton at the hospital, he returned to the house to find the door open again. Upon entering the house, he noticed the safe was missing. Donald testified that he did not know the combination to the safe. He further testified that when he told Clayton the safe was missing, Clayton became upset and said "Oh no."
 {¶ 28} Larry Andrews testified at trial that Clayton had been his legal guardian since Larry was 14 months old. Larry further testified that, in July 1999, Clayton opened the safe and asked Larry to count the money inside. Larry stated that the safe contained two stacks of bills totaling $50,000 and $25,000, respectively, and three envelopes, two of which contained $10,000 each, and one which contained $7,000. Larry further stated that all the money was in denominations of $100. Larry testified that Clayton probably used the $21,056 withdrawal in 1998 to purchase his 1999 Buick Century automobile.
 {¶ 29} On cross-examination, Larry testified that he did not conduct an inventory of the safe's contents after July 1999. Larry also testified that he gave Livengood the names of several individuals, including appellant's brother, Gene Tressler, to aid in the police investigation. On redirect, Larry testified that Clayton was very "frugal" with money, and he did not believe Clayton would have spent $100,000 between July 1999 and February 21, 2001.
 {¶ 30} Debra Knepper, a registered nurse, testified at trial that she was caring for Clayton in March 2001, when she heard appellant ask Clayton for his "bank book." On cross-examination, Knepper stated that sometimes other people help patients pay their bills.
 {¶ 31} Nicholas Karris testified that he sold appellant a 1998 Chevy S-10 pickup truck on February 21, 2001, and that appellant said he wanted to pay for his purchase with $100 bills. Karris further testified that appellant voluntarily told him he was able to pay cash for the truck because he had just won $20,000 in the lottery. Karris also stated that appellant told him he had a relative that was about to "pass away."
 {¶ 32} Rudy Straley, business manager for the car dealership, testified that he gave appellant a receipt for cash in the amount of $13,300, and that appellant paid the entire amount using $100 bills.
 {¶ 33} Barbara Thomas testified at trial that appellant is a regular customer at the Pioneer branch of the National Bank of Montpelier. Thomas further testified that when appellant applied for a loan on February 22, 2001, he said he needed the money to buy a truck from someone in Michigan. Thomas stated that, at the time appellant applied for the loan, there was a $3,700 mortgage on his home. She further stated that appellant wanted to secure the new loan with a second mortgage on his home. Thomas also testified that appellant told her he won $20,000 in the lottery and didn't know if he would actually need the loan.
 {¶ 34} Rex Miller testified that appellant paid off the balance of the mortgage on his home on August 29, 2001. Miller stated that appellant paid off the loan by writing a $10,000 check from his checking account, and also by signing over a check made out to appellant by Floyd White of Detroit, Michigan, in the amount of $5,000. On cross-examination, Miller stated that he did not know why White gave appellant the $5,000.
 {¶ 35} Mildred Tressler, appellant's mother, testified at trial that she lives with appellant and that, although the two share expenses, their finances are "tight." Tressler further testified that appellant never told her he won the lottery, and she was unaware that he could have had $13,300 in cash in the house. Tressler stated that, shortly before he was indicted by the grand jury, appellant transferred the title to his house and the pickup truck to her. On cross-examination, Tressler testified that she did not know that her brother had a safe, and that she did not know Clayton had died until she read his obituary in the newspaper. Tressler also testified that another one of her sons, Gene Tressler, has a criminal record and takes care of horses for a Floyd White, who lives in Michigan.
 {¶ 36} At the close of the above testimony, the prosecution rested its case. Defense counsel made a motion for acquittal pursuant to Crim. R. 29, which was denied. No testimony was presented on appellant's behalf. The trial court then found appellant guilty of safecracking as charged in Count 1 of the indictment, and theft from an elderly person in the reduced amount of $13,300, in violation of R.C. 2913.04(A)(1) 
(B)(3). A presentence investigation was ordered.
 {¶ 37} On March 13, 2002, a sentencing hearing was held. On March 25, 2002, the trial court filed a judgment entry in which it sentenced appellant to serve one year in prison for the crime of safecracking, and four years for the crime of theft from an elderly person, to be served concurrently. The court also ordered appellant to make restitution to Clayton Moreland's estate in the amount of $13,300. On April 11, 2002, a timely notice of appeal was filed.
 {¶ 38} Appellant asserts in his third assignment of error that the trial court erred when it relied on impermissible inferences in reaching a guilty verdict. Specifically, appellant argues that the trial court improperly inferred from the evidence presented at trial that: (1) appellant had anything to do with the removal and breaking of the safe; (2) the safe had money in it at the time it was removed from Clayton's home; (3) appellant took money from the safe; and (4) the $100 bills appellant used to purchase the pickup truck came from the safe.
 {¶ 39} It is well-settled in Ohio that "[a]n inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury." State v. Ebright
(1983), 11 Ohio App.3d 97, 99. However, "`[a]n inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a [trier of fact].'" Id., quoting Hurt v. Charles J. Rogers Transp. Co. (1955),164 Ohio St. 329, paragraphs one and two of the syllabus. In addition, courts have recognized that "`a given state of facts may give rise to two or more inferences, and in such case one inference is not built upon another but each is drawn separately from the same facts.'" Id., quotingMcDougall v. Glenn Cartage Co. (1959), 169 Ohio St. 522, paragraph two of the syllabus.
 {¶ 40} It is undisputed that, in July 1999, Larry Andrews saw approximately $100,000 in $100 bills in Clayton Moreland's safe. Several witnesses testified that Clayton was "tight" with his money and not inclined to give large gifts to others or make large purchases, other than his purchase of an automobile in 1998, which was still in his possession at the time of his death. No other evidence was presented that Clayton gave large gifts or purchased anything of substantial value, or that money had been removed from the safe for any other reason prior to its disappearance. From these facts, coupled with Clayton's obvious dismay upon finding out the safe was missing, it is reasonable to infer that the safe still contained all or substantially all of the $100,000 at the time of its disappearance.
 {¶ 41} It is further undisputed that the safe was kept in Clayton's spare bedroom, appellant was the only person who had a key to the house when Clayton was taken to the hospital on February 14, 2001, and appellant kept the house key until February 21, 2001, when appellant reported that Clayton's back door was unlocked. The next day, Donald Andrews reported the safe missing and, a few days later, the safe was found, broken and empty of money, in Indiana. From these facts, it can be reasonably inferred that the safe was stolen while appellant had the key to Clayton's home.
 {¶ 42} Evidence was also presented at trial that, even though appellant and his mother lived on a "tight" budget, appellant was able to purchase a 1998 Chevy S-10 pickup truck on February 21, 2001, with 133 $100 bills. This fact, when combined with the above inferences that there was money in the safe when it was stolen, and appellant had exclusive access to Clayton's house at the time of the theft, support the parallel inference that appellant was involved in the theft and breaking open of the safe, and the removal of the money that was inside. See Hurt v.Charles J. Rogers Transp. Co., supra. This inference is further supported by the undisputed fact that appellant lied to Karris, Straley and Livengood about the source of the cash he used to pay for the pickup truck, and he also lied to Thomas about why he wanted to take out a loan. See State v. Eaton (1969) 19 Ohio St.2d 145, 160, vacated on other grounds (1972), 408 U.S. 935. (It is "universally conceded" that lies told by an accused "are admissible evidence of consciousness of guilt, and thus of guilt itself" Id.).
 {¶ 43} Having found that the inferences relied upon by the trial court were permissible, we must now determine whether, as a matter of law, those inferences were sufficient to enable the trier of fact to exclude other inferences which might support a reasonable theory of innocence. State v. Ebright (1983), 11 Ohio App.3d 97, 101; State v.Graven (1978), 54 Ohio St.2d 114.
 {¶ 44} In this case, other than asserting that he used his "savings" to buy the pickup truck, appellant does not propose any theory of innocence that can be constructed upon the circumstantial evidence presented at trial. Appellant offers no explanation at trial as to how he managed to accumulate $13,300 in $100 bills on his "tight" budget. Instead, he argues that the evidence presented "was fraught with conjecture, speculation and impermissible inferences drawn upon inferences which fell short of establishing [his] guilt beyond a reasonable doubt * * *."
 {¶ 45} Upon consideration of the foregoing, we find that the inferences that can be most reasonably and logically drawn from the evidence presented, as set forth above, are those which are consistent with appellant's guilt, not his innocence. Accordingly, the circumstantial evidence is sufficient as a matter of law to enable the trier of fact to exclude all reasonable theories of innocence. Appellant's third assignment of error is not well-taken.
 {¶ 46} Appellant asserts in his first assignment of error that his convictions were not supported by "sufficient evidence."
 {¶ 47} The term "sufficiency of the evidence" refers to "that legal standard which is applied to determine whether * * * the evidence is legally sufficient to support the [trier of fact's decision] as a matter of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386 (other citation omitted). In a case in which the sufficiency of the evidence is challenged, the relevant inquiry on appeal is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. If a defendant's conviction is reversed based upon the sufficiency of the evidence, the defendant goes free. Thompkins, supra at 387.
 {¶ 48} In this case, appellant was charged with one count of safecracking, in violation of R.C. 2911.31(A), and one count of theft from an elderly person, in violation of R.C. 2913.02(A)(1) and (B)(3).
 {¶ 49} R.C. 2911.31(A) states:
 {¶ 50} "(A) No person, with purpose to commit an offense, shall knowingly enter, force an entrance into, or tamper with any vault, safe, or strongbox.
 {¶ 51} "(B) Whoever violates this section is guilty of safecracking, a felony of the fourth degree."
 {¶ 52} R.C. 2913.02 states, in relevant part:
 {¶ 53} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 54} "(1) Without the consent of the owner or person authorized to give consent;
 {¶ 55} "* * *
 {¶ 56} "(B)(3) * * * if the victim of the offense is an elderly person or disabled adult, a violation of this section is theft from an elderly person or disabled adult, and division (B)(3) of this section applies. * * * If the value of the property or services stolen is five thousand dollars or more and is less than twenty-five thousand dollars, theft from an elderly person or disabled adult is a felony of the third degree. * * *"
 {¶ 57} R.C. 2901.22 states, in relevant part:
 {¶ 58} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
 {¶ 59} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstance probably exist."
 {¶ 60} As to the charge of safecracking, we have already determined, in our disposition as to appellant's third assignment of error, that evidence was presented at trial from which the trial court properly concluded that appellant was purposely involved in the disappearance and subsequent destruction of Clayton Moreland's safe. Similarly, as to the charge of theft from an elderly person of property valued between $5,000 and $25,000, we have already determined that evidence was presented at trial from which the trial court properly concluded that appellant knowingly deprived Clayton Moreland of $13,300. It is undisputed that Clayton Moreland, at 75 years of age, qualifies as an "elderly person" under the meaning of the statute.
 {¶ 61} Upon consideration of the foregoing, we find that sufficient evidence was presented from which, when viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes of safecracking and theft from an elderly person were proven beyond a reasonable doubt. Appellant's first assignment of error is not well-taken.
 {¶ 62} Appellant asserts in his second assignment of error that the trial court's judgment was against the manifest weight of the evidence.
 {¶ 63} The Supreme Court of Ohio has held that weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins, supra, at 387. In determining whether a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and either agrees or disagrees with the factfinder's resolution of conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,42.
 {¶ 64} To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., citing State v. Martin
(1983), 20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
 {¶ 65} This court has considered the entire record of proceedings and, upon consideration thereof, the applicable law, and our disposition as to appellant's third assignment of error, we find no indication that the trier of fact lost its way or created a manifest miscarriage of justice in this case. Accordingly, the trial court's determination as to appellant's guilt was not against the manifest weight of the evidence, and appellant's second assignment of error is not well-taken.
 {¶ 66} Appellant asserts in his fourth assignment of error that the trial court did not comply with the purposes and principles of R.C. 2929.11 and 2929.12 when it sentenced him to serve four years in prison pursuant to his conviction for theft from an elderly person.
 {¶ 67} R.C. 2929.13(C) provides:
 {¶ 68} "[I]n determining whether to impose a prison term as a sanction for a felony of the third degree * * * the sentencing court shall comply with the purposes and principles of sentencing under section 2929.11 of the Revised Code and with section 2929.12 of the Revised Code."
 {¶ 69} The overriding purposes of the felony sentencing statutes are to "protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.11(A). Accordingly, the trial court's sentence should be reasonably calculated to achieve these purposes, mindful of the seriousness of the offender's conduct and its impact upon the victim, and consistent with other sentences imposed for similar conduct by similar offenders. R.C. 2929.11(B).
 {¶ 70} Pursuant to R.C. 2929.12(A), the trial court has discretion in determining "the most effective way to comply with the principles and purposes of sentencing set forth in R.C. 2929.11." Id. In exercising its discretion, however, a trial court must consider the factors enumerated in R.C. 2929.12(B) and (C) to determine whether the offender's conduct is more serious or less serious than conduct normally constituting the offense. The court must further evaluate the factors enumerated in R.C. 2929.12(D) and (E), which relate to the likelihood that the offender will commit future crimes.
 {¶ 71} Except in cases where a prison term is mandated by statute, the implementation of the principles set forth in R.C. 2929.11
rests within the sound discretion of the trial court. State v. Cooks
(1997), 125 Ohio App.3d 116, 118; R.C. 2929.12(A). The sentence imposed by the trial court will not be disturbed on appeal absent an abuse of that discretion. Id. at 120. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 72} The record shows that, at appellant's sentencing hearing, the trial court stated that it had reviewed the presentence investigation report and a report provided to the probation department by appellant's physician. Defense counsel then made a statement on appellant's behalf, in which he outlined for the trial court how the purposes and principles of sentencing would or would not be served by sending appellant to prison, after which appellant declined to make a statement to the court on his own behalf. Thereafter, the trial court stated:
 {¶ 73} "Well, Mr. Tressler, the law says you did it or at least you were involved. And I'm going to tell you again what I told you at the conclusion of the trial, and that is that I believe that although you may not have been an active participant in the removal of the safe and its breaking into it, that the preliminaries to those events involved you in some manner. There are other persons in your family and other persons who you know who have had involvement in the criminal justice system and are fully capable of performing acts such as that. I believe that your contact with them, whether in some manner whether originally innocent or not, led to these events. Be that as it may, they have not stepped forward to take the appropriate guilt or blame here and have left you holding the bag."
 {¶ 74} After making the above comments, the court found that appellant was not amenable to community control, and sentenced him to serve concurrent sentences of one year in prison for the crime of safecracking and four years in prison for the crime of theft from an elderly person. The court also ordered appellant to pay restitution in the amount of $13,300.
 {¶ 75} On March 25, 2002, the trial court filed a judgment entry in which it found:
 {¶ 76} "[f]or the reasons stated on the record, and after consideration of the factors under Ohio Revised Code § 2929.12, the Court finds that a prison sentence is consistent with the purposes of Ohio Revised Code § 2929.11, and the defendant is not amenable to an available community control sanction.
 {¶ 77} "The Court further finds, pursuant to Ohio Revised Code § 2929.14(B), that the shortest prison term will demean the seriousness of the defendant's conduct."
 {¶ 78} The court then sentenced appellant to prison and ordered him to pay restitution as set forth above. In addition, the court ordered appellant to pay "all costs of prosecution, and any supervision fees permitted" pursuant to R.C. 2929.18(A)(4), and advised him as to the terms of post-release control pursuant to R.C. 2967.28.
 {¶ 79} Appellant does not argue on appeal that the trial court failed to consider any or all of the sentencing factors set forth in R.C. 2929.12. Rather, appellant argues that the trial considered those factors and came to the wrong conclusion, i.e., that appellant should be sentenced to four years in prison instead of being placed on community control. In addition, appellant argues that the trial court's comments at trial and at the sentencing hearing regarding the possible involvement of persons other than appellant in this crime was a thinly disguised attempt to coerce appellant into revealing the identity of his accomplice.
 {¶ 80} The record demonstrates that, before sentencing appellant to prison, the trial court considered appellant's presentence report and medical report, and the arguments of defense counsel that appellant would be adequately punished if he were sentenced to community service and ordered to make restitution than if he were sent to prison. The record also reflects appellant's utter lack of remorse and his refusal to admit he had anything to do with the disappearance of the safe or the money. Those facts, coupled with the undisputed age and frail physical condition of the victim, and the trial court's belief, after hearing all the evidence, that appellant was protecting others who were involved in the crime, support the trial court's determination that appellant should be sentenced to serve a prison term rather than be placed on community control.
 {¶ 81} Upon consideration of the foregoing, we cannot find that the trial court abused its discretion by sentencing appellant to serve four years in prison after considering the factors set forth in R.C. 2929.12 and the principles and purposes of sentencing set forth in R.C. 2929.11. Appellant's fourth assignment of error is not well-taken.
 {¶ 82} Appellant asserts in his fifth assignment of error that the trial court erred by ordering him to serve a one year prison term for safecracking, a fourth degree felony, without making specific findings pursuant to R.C. 2929.13(B)(1)(a)-(i).
 {¶ 83} Pursuant to R.C. 2929.13(B)(2)(a), a court may impose a prison sentence on an offender for a fourth degree felony after it: (1) makes a finding as described in RC. 2929.13(B)(1)(a)-(i); (2) finds, after considering the factors set forth in R.C. 2929.12, that a prison term is consistent with the purposes and principles of sentencing set forth in R.C. 2929.11; and (3) finds that the offender is not amenable to an available community control sanction.
 {¶ 84} R.C. 2929.13(B)(1) provides that:
 {¶ 85} "[I]n sentencing an offender for a felony of the fourth or fifth degree, the sentencing court shall determine whether any of the following apply:
 {¶ 86} "(a) In committing the offense, the offender caused physical harm to a person.
 {¶ 87} "(b) In committing the offense, the offender attempted to cause or made an actual threat of physical harm to a person with a deadly weapon.
 {¶ 88} "(c) In committing the offense, the offender attempted to cause or made an actual threat of physical harm to a person, and the offender previously was convicted of an offense that caused physical harm to a person.
 {¶ 89} "(d) The offender held a public office or position of trust and the offense related to that office or position; the offender's position obliged the offender to prevent the offense or to bring those committing it to justice; or the offender's professional reputation or position facilitated the offense or was likely to influence the future conduct of others.
 {¶ 90} "(e) The offender committed the offense for hire or as part of an organized criminal activity.
 {¶ 91} "(f) The offense is a sex offense that is a fourth or fifth degree felony violation of section 2907.03, 2907.04, 2907.05, 2907.22,2907.31, 2907.321 [2907.32.1], 2907.322 [2907.32.2], 2907.323 [2907.32.3], or 2907.34 of the Revised Code.
 {¶ 92} "(g) The offender at the time of the offense was serving, or the offender previously had served, a prison term.
 {¶ 93} "(h) The offender committed the offense while under a community control sanction, while on probation, or while released from custody on a bond or personal recognizance.
 {¶ 94} "(i) The offender committed the offense while in possession of a firearm."
 {¶ 95} Pursuant to R.C. 2953.08(A)(2), a defendant may appeal a prison sentence imposed for a fourth degree felony if "the court did not specify at sentencing that it found one or more factors specified in division (B)(1)(a) to (i) of section 2929.13 * * * to apply relative to the defendant. * * *" In addition, R.C. 2953.08(G)(1) provides that:
 {¶ 96} "If the sentencing court was required to make the findings required by division (B) * * * of section 2929.13 * * * of the Revised Code relative to the imposition or modification of the sentence, and if the sentencing court failed to state the required findings on the record, the court hearing an appeal under division (A), (B), or (C) of this section shall remand the case to the sentencing court and instruct the sentencing court to state, on the record, the required findings.
 {¶ 97} As set forth above, the record demonstrates that the trial court found, after considering the factors set forth in R.C. 2929.12, that a prison sentence is consistent with the purposes of R.C. 2929.11, and that appellant is not amenable to community control. However, it is undisputed that the trial court did not make any findings pursuant to R.C. 2929.13(B)(1)(a)-(i).
 {¶ 98} Upon consideration of the foregoing, we find that the trial court erred by sentencing appellant to a one year term for the crime of safecracking, a fourth degree felony, without making the mandatory finding pursuant to R.C. 2929.13(B)(1)(a)-(i). Accordingly, appellant's fifth assignment of error is well-taken.
 {¶ 99} The judgment of the Williams County Court of Common Pleas is hereby affirmed in part and reversed in part. This case is hereby remanded to the trial court for resentencing in accordance with this opinion. Court costs of this appeal are assessed to appellee, the state of Ohio.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
Peter M. Handwork, P.J., Richard W. Knepper, J., and GeorgeM. Glasser, J., CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.