{¶ 32} I respectfully dissent from the majority decision affirming El-Berri's convictions for rape and kidnapping. The facts do not show that he compelled the victim to submit by force or threat of force, neither do they show that he restrained her liberty in any manner. Although El-Berri's conduct with a minor whom he employed was wholly inappropriate and distasteful to say the least, it did not support a finding of guilt on the charged offenses.
 {¶ 33} A more complete recitation of the facts shows that at trial, the victim's mother testified that her boyfriend owned a store where she and her daughter, the victim, worked. The boyfriend leased a portion of the store to a cell phone company owned and operated by El-Berri and his girlfriend. The victim's mother said that she and the girlfriend became friendly, and that she would sometimes fill in at the cell phone store for the girlfriend. The mother said that El-Berri had trained the victim in the cell phone business and that he employed her at the boyfriend's store.
 {¶ 34} In December 2004, El-Berri assigned the victim to work at one of his stores located in a shopping mall. On the night of the incident, El-Berri scheduled the victim to work until 11:00 p.m. A heavy snow was falling that night and the victim's mother became concerned about the victim's ability to drive in poor weather. In its recitation of the facts, the majority states that "El-Berri offered to drive the victim home as she lacked experience driving in snow *Page 14 
storms." Ante at 1. This statement is not exactly correct. It is undisputed that the mother called the victim to see if she wanted to be picked up. The mother testified that the victim told her El-Berri would give her a ride home; the victim testified that her mother asked her if El-Berri would give her a ride.
 {¶ 35} As they traveled on the interstate, El-Berri told the victim that he needed to stop by his house to get something. The victim testified that El-Berri asked her if he could make a detour to his house in order to get something, and that she told El-Berri it was "okay."
 {¶ 36} When he pulled up to the house, El-Berri asked the victim if she wanted to come in with him. She agreed to do so. When they entered the house, El-Berri went into another room while the victim remained in the kitchen. El-Berri called for the victim to join him. She went into the living room and El-Berri started to rub her back. She did not say anything while he did this. He then bent her over the couch and started to unbutton her pants. During her testimony, she said that she was "scared" when asked what her thoughts were at the time, but she did not say anything to El-Berri. She testified that El-Berri pulled down her pants and underwear and then "put his penis in [her] vagina." She did not recall how long his penis was in her vagina, but when he removed his penis, El-Berri asked her if she was ready to go. She replied that she was, pulled her clothes up and left with him. The victim testified that as they were leaving, El-Berri's car became stuck in the snow. Unable to move the car, he *Page 15 
called for a cab and both she and El-Berri went back in the house to wait. The victim stated that it took awhile for the cab to arrive, and neither she nor El-Berri said anything to each other during the wait.
 {¶ 37} When the cab arrived, El-Berri gave the victim money to pay the fare. The victim entered the cab and gave the driver directions to her house. At the same time, the mother, having grown concerned because the victim had not arrived home, called the victim's cell phone and asked where she was. The victim told her she was on her way home in a cab. When asked, "Did your mom want to know why you were in a cab," the victim responded, "I told her I would talk to her when I get home."
 {¶ 38} When the victim arrived home, she learned that her mother was talking on the telephone with El-Berri's girlfriend. The victim went into a bedroom and her mother handed the telephone to her. The victim briefly spoke with the girlfriend. The mother testified that the two argued on the phone. However, during cross-examination, the victim indicated that she and the girlfriend did not argue at all. Furthermore, when asked, "It was just a pleasant conversation, you told her you are with Tamer and that was that, right?" The victim answered, "yes." When she concluded the telephone call, the victim stated that she told her mother "what happened" with El-Berri.
 {¶ 39} The direct examination went as follows:
 {¶ 40} "Q. Did you tell your mom, once the phone conversation stopped — *Page 16 
when you got home your mom was on the phone. Then there came a time when your mom was no longer on the phone. Okay?
 {¶ 41} "After your mom was no longer on the phone did you tell your mom what happened?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. How did that come about?
 {¶ 44} "A. I don't remember. I just remember telling her.
 {¶ 45} "Q. Do you remember what you told your mom?
 {¶ 46} "A. I told her what happened.
 {¶ 47} "Q. Back at Tamer's house?
 {¶ 48} "A. Yes."
 {¶ 49} The mother and her boyfriend then drove to El-Berri's house to confront him. The mother testified that the girlfriend answered the door and said to her, "you better not have your f***ing daughter with you." The mother angrily confronted El-Berri as he stood in the doorway and asked him "how could he betray me." The mother testified that her boyfriend said something, however, what was said is not in the record. Whatever the boyfriend stated, the mother testified that El-Berri said, "it is not like he was the first one." The mother stated that El-Berri invited them in to talk, but she refused.
 {¶ 50} The mother and her boyfriend returned home and the mother took the victim to the hospital emergency room. Results from a rape kit revealed the *Page 17 
presence of seminal fluid on vaginal swabs, rectal swabs and the victim's underwear, but no semen was found on the vaginal smear slide, the rectal smear slide, the oral smear slide, the oral swabs, or the skin swabs. The source of the seminal fluid could not be determined as testing was unable to produce a male DNA profile. A record from the hospital emergency room contained an account of events that stated, "when the boss's [girlfriend] asked [the victim] if the patient had `slept with Tamer' the patient said yes."
 {¶ 51} For his defense, El-Berri offered the testimony of the girlfriend who also lived with El-Berri. She stated that she ended her relationship with El-Berri immediately after the incident. She said that she had developed a close relationship with both the victim and her mother, and thought of herself and the victim as "almost best friends" and that the victim would tell others that they were "sisters" because they looked so much alike. The girlfriend testified that during the week before the incident occurred, and apparently coinciding with the victim's assignment to the mall location, she noticed El-Berri acting "a little weird" and staying longer at work than normal. While at her mother's house on the night in question, the girlfriend became concerned when El-Berri was not home by midnight, so she called the victim's mother to inquire into the victim's whereabouts. The victim's mother told the girlfriend that the victim was working with El-Berri. The girlfriend said that this was when she first learned that the victim had been working at the mall with El-Berri, and it aroused her *Page 18 
suspicions. Later that evening, she again called the mother to find out if the victim had come home, thinking that if the victim had arrived home, it meant that El-Berri likewise should be home. The girlfriend and the victim's mother were on the telephone when the victim's cab arrived. The girlfriend asked the mother to go to the cab driver and ask him where he had picked up the victim. When told that the cab had come from El-Berri's house, it confirmed the girlfriend's suspicions that El-Berri and the victim were having an affair. At that point, the girlfriend asked to speak with the victim and told her to admit that she was having an affair with El-Berri. The victim admitted to the girlfriend that she had an affair with El-Berri, but said that they only had sex one time.
 I {¶ 52} At common law, the crime of rape was defined as "the unlawful carnal knowledge, by a man, of a woman, forcibly and against her will."Smith v. State (1861), 12 Ohio St. 466, 470. The courts interpreted rape as requiring proof of certain conduct by both the accused and the victim.
 {¶ 53} "Because `against her will' is synonymous with `without her consent,' many jurisdictions substituted the latter term. The prosecution, therefore, in order to satisfy its burden of proving all of the elements of the crime charged, had to establish both the victim's lack of consent and the defendant's use of force. The focus on the conduct of both the victim and the defendant resulted in the *Page 19 
rule that the victim had to prove `resistance to the utmost' to establish rape. Absent such resistance, rape was not established, notwithstanding evidence of the use of force." Wilk, Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution (1984), 33 Am.U. L.Rev. 417, 420-421. See, also, State v.Driscoll (1922), 106 Ohio St. 33, 40; Frey v. State (1907), 22 Ohio C.C. (N.S.) 607, 608.
 {¶ 54} A drawback of the "consent" requirement was that it tended to encourage a focus on the complainant's state of mind, and evidence of her prior sexual experience was often used to insinuate that she wanted to have sex. Abrams, Hearing the Call of Stories (1991), 79 Cal. L.Rev. 971, 1033-1034. To prevent such tactics, many modern statutes, guided by the Modern Penal Code, eliminated the express requirements of unwillingness or nonconsent.[1] The drafters explained that the Code's approach was not that "consent by the victim is irrelevant or that inquiry into the level of resistance by the victim cannot or should not be made. Compulsion plainly implies non-consent * * *." Model Penal Code, Section 213.1, comment, at 301-306. One commentator has stated that under the Model Penal Code approach:
 {¶ 55} "The resistance standard is rejected where force is proved, but *Page 20 
`resistance by a woman of ordinary resolution' is the statutory standard used to define Gross Sexual Imposition, where the force exerted by the defendant is not an element. Thus, while the drafters intended to focus primarily on the actions of the defendant, they continued to stress the importance of the victim's non-consent. The drafters noted that `the possibility of consent by the victim, even in the face of conduct that may give some evidence of overreaching, cannot be ignored,' and echoed the concern of other commentators concerning the ambivalence of women toward forceful sexual intercourse. It was therefore clearlyintended that the language `compels [the victim] to submit by force'includes proof of the victim's non-consent." (Emphasis added.)
 {¶ 56} Ohio modeled its rape statute on the Model Penal Code.[2] As applicable to this case, R.C. 2907.02(A)(2) states that no person shall engage in sexual conduct with another when "the offender purposely compels the other person to submit by force or threat of force." A defendant purposely compels a victim to submit by force or threat of force when the defendant uses physical force against the victim, or creates the belief that physical force will be used if the victim does not submit. State v. Schaim, 65 Ohio St.3d 51, 55, 1992-Ohio-31. *Page 21 
Depending on age and relationship, force "need not be overt and physically brutal, but can be subtle and psychological." State v.Eskridge (1988), 38 Ohio St.3d 56, 58-59; Schaim, 65 Ohio St.3d at 55. Physical resistance must no longer be shown by the victim. See R.C. 2907.02(C) ("A victim need not prove physical resistance to the offender in prosecutions under this section.").
 {¶ 57} Lack of consent is no longer an express element of rape.[3]
Nevertheless, there is an undeniable interplay between the concepts of resistance and consent. R.C. 2907.03(C) states only that the victim does not have to prove "physical" resistance to the defendant. This is not the same as saying that no resistance of any kind is required. With certain exceptions addressed shortly, if the use of force or threat of force is not apparent from the defendant's conduct, there must be some evidence of lack of consent or resistance to show that the defendant "purposely compel[led]" the other person to submit. See R.C. 2907.02(A)(2). Absent this showing, there would be no evidence that the defendant had the mens rea to cause the victim to capitulate. If the victim does nothing to communicate, either verbally or nonverbally, a lack of consent, a defendant cannot be found to have compelled the victim to submit to the sexual conduct.[4] A victim must affirmatively convey some indicia of non-consent as a *Page 22 
predicate to a finding that the victim had been, in the absence of any force or threat of force, compelled to submit to the sexual conduct.[5]
 {¶ 58} I am aware that there are proponents of the concept of "affirmative consent." These advocates suggest that in the absence of express words of consent, the victim must be deemed to be non-consenting. See, generally, Note, Addressing Acquaintance Rape: The New Direction of the Rape Law Reform Movement (1995), 69 St. John's L.Rev. 291, 310-312. This standard, however, is inconsistent with R.C. 2907.02(A)(2), which requires the offender to have purpose to compel the other person to submit to sexual conduct by force or threat of force. A standard that would, in the absence of force or threat of force, allow a *Page 23 
victim to say nothing or manifest no form of resistence during the act but later voice her lack of consent, would fail as a matter of law under circumstances like those presented here because the defendant could not know that compulsion had been used against the victim.
 II {¶ 59} The dispositive question is whether, in the absence of any evidence relating to force or the threat of force, El-Berri compelled the victim to engage in sexual conduct with him. The majority's discussion of the facts going to the elements of the offense is incomplete and belies the victim's own testimony. It offers no facts to show any force or threat of force used against the victim, and ignores significant testimony by the victim which showed that at all events she never communicated, in any manner whatsoever, that she did not consent to El-Berri's advances.
 {¶ 60} During direct examination by the state, the victim said that she asked El-Berri for a ride home, agreed to detour to his house, and further accepted his invitation to enter his house. When asked whether she said anything to El-Berri as he rubbed her back, the victim at first said, "I don't remember," and when asked again, she said "no." When asked whether she said anything to El-Berri as he began to remove her pants and underwear, she said "no." Although she testified that she was "scared" as El-Berri did these things, when asked if there was any reason why she did not say anything at the time, *Page 24 
the victim replied, "No. I don't know." Even though she claimed that she did not voluntarily bend over the couch, she continued to remain silent throughout. After referencing the specific act of penetration, the state asked the victim, "[i]s there any reason why you didn't say anything to him?" She replied, "I don't know." The testimony shows that her only word to him during and after the incident was "yes" when asked "if she was ready to go."
 {¶ 61} The victim's cross-examination further confirmed her lack of communication throughout the incident:
 {¶ 62} "Q. And you told the prosecutor that he began rubbing your back, correct?
 {¶ 63} "A. Yes.
 {¶ 64} "Q. And you didn't say anything, right?
 {¶ 65} "A. Right.
 {¶ 66} "Q. And then he basically started removing your pants?
 {¶ 67} "A. Yes.
 {¶ 68} "Q. And, again, you indicated to the prosecutor that you didn't say anything?
 {¶ 69} "A. Right."
 {¶ 70} After questioning the victim regarding how El-Berri penetrated her, the defense asked the following:
 {¶ 71} "Q. Again, you never said anything to him while he was doing this, *Page 25 
correct?
 {¶ 72} "A. Right.
 {¶ 73} "Q. And you knew Tamer, right?
 {¶ 74} "A. Yes.
 {¶ 75} "Q. You have known him for a while, right?
 {¶ 76} "A. Right.
 {¶ 77} "Q. Yet you never said Tamer, what are you doing?
 {¶ 78} "A. No, I didn't.
 {¶ 79} "Q. Never said Tamer, I don't want to do this?
 {¶ 80} "A. No.
 {¶ 81} "Q. Never said Tamer, hey, [your girlfriend] and I are friends and if she finds out we are all going to be in trouble. Do you ever say that?
 {¶ 82} "A. No.
 {¶ 83} "Q. Did it ever occur to you?
 {¶ 84} "A. Yes."
 {¶ 85} At no point in any of the victim's testimony does it show that El-Berri used physical force of any kind to engage in sexual conduct. Neither is there any evidence from which a reasonable trier of fact could find that El-Berri compelled the victim through nonphysical means or by the threat of force. The victim gave no verbal objection to his actions, nor did she engage in any form of nonverbal conduct, hesitation, or resistance to indicate that she did not consent *Page 26 
to El-Berri's actions. Likewise, the state offered no evidence to show that El-Berri said anything coercive or threatening to the victim in the moments leading up to the sexual conduct.
 {¶ 86} While testifying, the victim stated that she was "scared" during the incident. However, her testimony does not indicate what she was afraid of or why she was scared. Unlike her earlier testimony where she specifically explains how she "was scared to drive in the snow," she did not testify that she was scared of El-Berri, scared that he might harm her or of what he might do to her, scared of losing her job, or scared of his retaliating against her. She may very well have been scared of having intercourse or scared of El-Berri's girlfriend coming home or scared of the unknown. All of these possibilities are plausible based on the evidence. The majority erroneously concludes that the victim's acknowledgment that she had been scared during the incident was sufficient to show that El-Berri used force or the threat of force to compel her to submit. The majority's conclusion is a non sequitur because it does not necessarily follow that a person is being forced or compelled to do anything just because she is scared. Furthermore, the victim did not testify in any manner which would indicate that El-Berri knew she was afraid. If there had been any testimony to the effect that the victim's fear was manifest in any form or fashion, that evidence could be deemed sufficient to communicate to El-Berri that he was compelling the victim's submission to his advances. But the victim's testimony did not indicate *Page 27 
that her fear, whatever its origin, was apparent or obvious to El-Berri. By her own admission, she wordlessly allowed him to escalate the encounter and engage in sex with her.
 {¶ 87} This analysis is not to suggest what the victim should or should not have done under the circumstances. But accepting her testimony as true, no reasonable trier of fact could conclude that there was evidence to show El-Berri knew that the victim did not consent to his actions. A defendant cannot be found to have compelled another to submit by force or threat of force when the evidence fails to show that the victim gave the defendant reason to know that she was being compelled. Under the circumstances of a case like this one, without any affirmative evidence showing lack of consent, a defendant will have no reason to know that his advances are unwelcome and therefore non-consensual.
 {¶ 88} The majority finds compelling as evidence of the element of force the victim's statement that El-Berri "bent" her over the couch to have sex with her. The victim's use of the word "bent," standing alone, does not establish that El-Berri used force. Indeed, the most detailed account of his actions is given by the victim's testimony in response to being asked to describe the scenario where she states, "Like he put my arms on the couch and bent me over." A fair reading of the testimony shows that El-Berri positioned her over the couch rather than forced her over it against her will as the majority. This conclusion is consistent with the absence of any other testimony to show that El-Berri used force of any *Page 28 
kind during this part of their encounter. For each action he made, whether rubbing her back, removing her clothes or bending her over the couch, the victim made no outward manifestation whatsoever that any of these actions were unwanted or that she was scared. A mere reference to being bent over the couch does not amount to force under these circumstances.
 {¶ 89} The majority likewise errs by accepting the argument that the victim was only 16 and one-half years old at the time and could not be expected to have the emotional or practical experience necessary to deal with the situation that was presented in this case.
 {¶ 90} In State v. Eskridge (1988), 38 Ohio St.3d 56, Eskridge was convicted of raping his four-year-old daughter and sentenced to life imprisonment on a finding that he used force during the commission of the rape. This court reversed the life sentence because it concluded that the state failed to present any evidence that Eskridge used force. The supreme court reversed this court, stating in paragraph one of the syllabus that "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength." In reaching this conclusion, the supreme court noted that the element of force as charged in a rape case "need not be overt and *Page 29 
physically brutal, but can be subtle and psychological." Id. at 58-59.
 {¶ 91} In State v. Schaim, 65 Ohio St.3d 51, 1992-Ohio-31, the supreme court considered an appeal in which Schaim had been convicted of repeatedly demanding sex from his 19-year-old daughter in exchange for granting her certain privileges, even though there had been no proof of force. The state argued that a pattern of incest could suffice to establish the force element. The supreme court rejected this argument, explaining that:
 {¶ 92} " State v. Eskridge is based solely on the recognition of the amount of control that parents have over their children, particularly young children. Every detail of a child's life is controlled by a parent, and a four-year-old child knows that disobedience will be punished, whether by corporal punishment or an alternative form of discipline. Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements of forcible rape. Id., paragraph one of the syllabus.
 {¶ 93} "The same rationale does not apply to an adult. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. Although we are aware of *Page 30 
the devastating effects of incest on its victims, and are sympathetic to the victim whose will to resist has been overcome by a prolonged pattern of abuse, we reluctantly conclude that a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2). A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her." Id. at 55.
 {¶ 94} The victim in this appeal was 16 and one-half years old at the time of the incident, falling between the Eskridge "child of tender years" and the Schaim "woman over the age of majority." She was a sophomore in high school, had obtained her driver's license five months before the events in this case, worked, and at all times during the night of the incident had her cellular telephone with her. The victim had no filial relationship with El-Berri. She met El-Berri because he leased retail space in a store owned by her parents. She developed a close friendship with El-Berri's girlfriend and, on one or two occasions, even socialized with the girlfriend and El-Berri. When the girlfriend worked at the store owned by the victim's parents, the victim spent so much time *Page 31 
with her that she became knowledgeable about El-Berri's business. He then hired her to work at his retail space located inside the store owned by the victim's parents, although that arrangement appeared to be informal. The victim testified that she earned a commission on each cell phone that she sold and El-Berri paid her in cash. The victim was unclear as to exactly how long she had worked at El-Berri's mall location, saying that it was "more than a week."
 {¶ 95} Unlike the four-year-old victim of incest in Eskridge, there is no evidence in this case to show or suggest that El-Berri had any type of control over the victim. Likewise, there was no evidence to show that the victim's age caused her to be so dependent on El-Berri that she capitulated to his advances because of fear or duress. The evidence shows that the victim was very friendly with El-Berri and his girlfriend and apparently comfortable enough around El-Berri to 1) ask him to drive her home, 2) consent to stopping at his house, 3) agree to go inside with him, and 4) go back inside the house with him to wait for a cab after the sexual encounter had occurred. Throughout all of the events in his house that led to the sexual encounter, the victim's only response to why she did not object to El-Berri's advances was "I don't know." This testimony was insufficient to show the kind of subtle coercion addressed inEskridge. The victim gave no outward indication of her state of mind, and admitted that she said nothing to El-Berri. She gave no nonverbal communication, either by hesitating, resisting or showing her fear, to communicate her lack of consent. *Page 32 
Importantly, at no point in her testimony did the victim attribute her silence to being "scared." As events escalated, the victim remained silent, giving El-Berri no indication that his actions were unwanted. With the absence of force or subtle coercion, El-Berri could not know that his advances were unwelcome. To find otherwise would make the actions of any initiator in a sexual encounter no different from those of a rapist.
 III {¶ 96} With regard to the kidnapping count, I find no evidence to support the majority's assertion that El-Berri's "true purpose" was to "lure the victim to his house in order to engage in sexual activity with the victim against her will." Ante at 5.
 {¶ 97} Viewing the evidence in a light most favorable to the state shows that the victim, or her mother, asked El-Berri to give her a ride home. He drove past her exit on the freeway, and told her that he was "going to stop at his house and get something." When asked if that was "okay" with her, the victim said "yes." When they arrived at his house, El-Berri "asked me if I was going to come in. I said sure." They entered through the kitchen door. El-Berri walked through the kitchen and entered a different room — either the bedroom or the living room. The victim remained in the kitchen until he called for her to join him. The victim walked into the living room and El-Berri said something to her, but she could not recall what he said. He then began rubbing her back. *Page 33 
 {¶ 98} None of this evidence shows that El-Berri restrained the victim's liberty. As noted in the discussion of the rape count, El-Berri did not use any physical force or restraint against the victim. To the contrary, he asked for the victim's permission to stop at the house and she consented to enter. There is simply no evidence to show that El-Berri restrained the victim's liberty at any point in time.
 {¶ 99} The majority appears to conclude that El-Berri deceived the victim by bringing her to his house under pretense while all along intending to sexually assault her.
 {¶ 100} The word "deception" is not defined in R.C. Chapter 2905. However, R.C. 2913.01(A) defines "deception" as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, * * * or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." Although this definition does not expressly apply to R.C. Chapter 2905, it nonetheless conforms to the generally-accepted meaning of the word "deception," so I apply it here. See R.C. 1.42; State v. Young (July 28, 1992), Meigs App. No. 458.
 {¶ 101} The majority's assertion that El-Berri "lured" the victim to his house in order to engage in "sexual activity with the victim against her will" finds absolutely no support in the record. There is no evidence of any kind to show *Page 34 
what El-Berri's intentions were as they drove from the mall. Even if one assumes that he did hope to engage in sexual activity with the victim, the trial testimony did not show that he intended to do so against her will. To the contrary, he asked for and received the victim's permission to stop at his house. Once at the house, he asked her if she wanted to come inside without any threat or hint of force or duress. Whatever El-Berri's intentions may have been, there is no evidence to show that he deceived the victim into entering his house.
 {¶ 102} The only evidence to show El-Berri's purpose in going to his house was the victim's testimony that he needed to stop by his house to get something. The victim did not know or did not say what El-Berri needed to retrieve from the house, but there is no question that he entered a least one other room of the house while she remained standing in the kitchen. This conduct at least supports the possibility that he accomplished his purpose of retrieving something from his house. At all events, El-Berri made no demonstrably false statements to the victim, and she willingly agreed to accompany him regardless of any unstated ulterior motive he may have had.
 IV {¶ 103} Having reviewed all the evidence in a light most favorable to the state, I find as a matter of law that the state failed to prove all the elements of rape and kidnapping beyond a reasonable doubt. Although there are jurisdictions that make it unlawful for someone of El-Berri's age to have sexual *Page 35 
intercourse with a 16-year-old, [6] Ohio is not one of those jurisdictions. With the absence of force or threat of force, the state could only prove that a rape occurred by offering evidence that the victim did not consent to engaging in sexual conduct with El-Berri and that she communicated her lack of consent to him. The state failed to elicit any testimony from the victim showing that she communicated her lack of consent to El-Berri. As despicable as El-Berri's conduct on the night of this incident may be viewed, I find the evidence legally insufficient to establish the rape and kidnapping counts. I therefore dissent.
[1] Section 213.1 of the Model Penal Code states, "(1) Rape. A male who has sexual intercourse with a female not his wife is guilty of rape if: (a) he compels her to submit by force or threat of force or by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone; * * *."
[2] "In its deliberations and as a guide, the Technical Committee and its staff relied on the Model Penal Code [MPC] of the American Law Institute, as well as the revised criminal codes from Illinois, New York and Wisconsin." Lehman and Norris, Some Legislative History and Comments on Ohio's New Criminal Code (1974), 23 Cleve.St. L.Rev 9. See, also,State v. Graven (1978), 54 Ohio St.2d 114, 122 (Celebrezze, J., dissenting) ("The General Assembly, in revising the Ohio Criminal Code, used the American Law Institute's Model Penal Code (1962) for guidance and language.").
[3] Consent is considered a defense to rape, albeit not an affirmative defense. See State v. Gilliam (Sept. 30, 1999), Montgomery App. No. 17491; State v. Keeton, Richland App. No. 03 CA 43, 2004-Ohio-3676.
[4] Some commentators have complained that courts have not been "interpreting `without consent' to mean the absence of what is popularly understood to be `consent,' yet instead have defined `without consent' as `without affirmative consent and with affirmative dissent,' thereby broadening the definition of consent to include acquiescence. See Note, Acquaintance Rape and Degrees of Consent: "No" Means "No," but What Does "Yes" Mean? (2004), Harv. L.Rev. 2341, 2348, fn.36, quoting Berliner, Note, Rethinking the Reasonable Belief Defense to Rape (1991), 100 Yale L.J. 2687, 2689. This line of thinking is arguably at odds with other aspects of the law which routinely hold that a failure to voice objection is tantamount to consent in situations where one would be expected to voice disapproval. It in essence puts one person involved in a sexual encounter in the position of being a mind-reader when the other person makes no physical, verbal or non-verbal communication of a lack of consent, and for that reason is impractical as a legal standard.
[5] R.C. 2907.02(A)(1) defines a separate offense of rape that occurs when the offender engages in sexual conduct with a person other than a spouse and (a) substantially impairs that person's ability to consent by surreptitiously administering any drug, intoxicant, or controlled substance to the other person, (b) the other person is less than 13 years of age, or (c) the offender knows the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age. See R.C. 2907.02(A)(1)(a)-(c). The state did not charge El-Berri under R.C. 2907.02(A)(1), and there is no suggestion in the record that the victim lacked the ability to resist or consent, or that her ability to do so was substantially impaired by El-Berri.
[6] See, e.g., Cal.Crim. Code 261.5(b)-(d); Col.Rev.Stat. 18-3-402; N.Y.Pen. Code 130.25(2). *Page 1