THE STATE OF OHIO, APPELLEE, *v.* GRAVEN, APPELLANT.

(No. 76-1290—Decided April 26, 1978.)

*Mr. George C. Smith,* prosecuting attorney, and *Mr. Alan C. Travis,* for appellee.

*Messrs. McDonnell & Sweeney* and *Mr. Daniel P. McDonnell,* for appellant.

*Per Curiam.*

I.

Considering, first, appellant's argument that the trial court committed prejudicial error in permitting the testimony of state's witness Anne Bloomberg in rebuttal, which, appellant contends, did not counteract any of the evidence by the defense but merely bolstered the state's case in chief, we find it to be without merit.

Appellee contends that Anne Bloomberg's testimony that appellant during the time herein involved drove a political candidate to and from various campaign functions, that appellant did proportionally more driving than other volunteer drivers, that she had little trouble contacting appellant at his home and that he was adequately available rebuts the testimony of the defense witness, Robert Graven. The testimony of Robert Graven, appellant's father, was that appellant drove him to various meetings and made photographic enlargements for his presentations. Resolution of the nature of the testimony, however, is not required to answer this proposition of law. The trial judge is granted discretion in the admitting of evidence out of order, and absent a patent abuse of this discretion no prejudicial error was committed. *Cities Service Oil Co.* v. *Burkett* (1964), 176 Ohio St. 449; *Holt* v. *State* (1923), 107 Ohio St 307. See, also, *State* v. *Vails* (1970), 22 Ohio St. 2d 103. Furthermore, R. C 2945.10, cited by appellant as providing for the order of proceedings in trial, reads, in relevant part:

"(D) The state will then be confined to rebutting evidence, but the court, for good reason, in furtherance of justice, *may permit evidence to be offered by either side out of its order.*" (Emphasis added.)

## II.

Appellant's assertion of error relating to the trial court's instruction to the jury is also fatally defective. A perusal of the record reveals that the Court of Appeals correctly disposed of this allegation, in its opinion wherein the court stated:

"* * * However, no objection was made by defendant, nor did defendant call this error to the attention of the trial court. Accordingly, defendant is precluded by Crim. R. 30 from using this issue on appeal."

This court has consistently refused to permit a party to leave errors uncorrected at the trial, when they could be corrected, only to later attempt to gain a reversal on appeal. *State* v. *Williams* (1977), 51 Ohio St. 2d 112; *State* v. *Gordon* (1971), 28 Ohio St. 2d 45; *State* v. *Lancaster* (1971), 25 Ohio St. 2d 83; *State* v. *Davis* (1964), 1 Ohio St. 2d 28. "Any other rule," this court stated in *State* v. *Driscoll* (1922), 106 Ohio St. 33, at page 39, "would relieve counsel from any duty or responsibility to the court and place the entire responsibility upon the trial court to give faultless instructions upon every possible feature of the case, thereby disregarding entirely the true relation of court and counsel which enjoins upon counsel the duty to exercise diligence and to aid the court rather than by silence mislead the court into commission of error. ***" To permit this gamesmanship would only prolong the final adjudication of the case. Accordingly, this assertion of error is not well taken.

## III.

Appellant's other two propositions of law raise the issue of the sufficiency of the evidence. Specifically, appellant argues that the trial court erred in denying his motion for acquittal and that the verdict is against the manifest weight of the evidence. These assertions are premised upon appellant's argument that appellee failed to estab-

lish various elements of the alleged crime, *i. e.*, that appellant deceived the state of Ohio, that the appellant practiced deception, and proof of appellant's culpable mental state.

Our consideration of these propositions is limited to an examination of the record at the trial to determine whether evidence was presented, "which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Atkins* v. *State* (1926), 115 Ohio St. 542, 546. This review is thus confined to a determination of whether there was sufficient evidence to support the verdict rendered. *State* v. *Sheppard* (1956), 165 Ohio St. 293; *State* v. *Stewart* (1964), 176 Ohio St. 156.

A review of the record reveals that appellee produced evidence that appellant was employed as a boiler inspector trainee by the Department of Industrial Relations from April 1, 1974, to October 26, 1974, and that he accepted the compensation for this position. Appellee, through the utilization of a two-pronged approach, tried to prove that appellant at no time performed any work for the state of Ohio. First, appellee attempted to show that appellant did not perform the duties of his job description. To this end, appellee called Mr. Ralph Yost, who testified that he was in charge of training classes for the boiler inspector trainees, that the appellant never attended any training classes nor submitted any periodic reports, as required in the job description, and that he was unaware of appellant's being on the payroll. Mr. Charles Huff testified that he spent 90 percent of his time at the office and that he was unaware that appellant was on the state's payroll. Furthermore, appellee introduced evidence that appellant, while receiving payroll warrants, was engaged in other activities. Evidence was presented that, during a portion of this period, appellant was enrolled as a full-time student at Cuyahoga Community College and attended day classes. Additionally, there was the evidence previously discussed herein that appellant drove for a political candidate in connection with his campaign on at least 13 days, for which appellant was paid by the state of Ohio to perform duties for it.

Essentially, appellant contends that the evidence that he committed deception, *i. e.,* "did not work," in obtaining the payment of a salary from the state of Ohio, was either not produced or insufficient to find him guilty beyond a reasonable doubt. Clearly, appellee was confronted with the difficult task of proving beyond a reasonable doubt not only that appellant failed to perform the specified functions of a boiler inspector trainee, but also that he failed to provide any other services for his pay warrants.

Absent an admission of guilt by the appellant, or the testimony of one no less closely associated with the appellant than his shadow, certain elements of the alleged crime could only be proved by circumstantial evidence. Appellant's specious characterization of this evidence as "an inference upon an inference" and "an inference * * * from negative testimony" and his impractical assertion that only the testimony of witnesses who were constantly with him and never saw him work would be sufficient are inverse to the accepted proposition that a fact may be proved to a moral certainty by circumstantial evidence as well as direct evidence. *State* v. *Nevius* (1947), 147 Ohio St. 263. Therefore, it is axiomatic that criminal conduct may be and, in many instances, can only be proved by circumstantial evidence. However, the circumstantial evidence relied upon to prove an essential element of the crime must be irreconcilable with any *reasonable* theory of the accused's innocence in order to support a finding of guilty. *State* v. *Kulig* (1974), 37 Ohio St. 2d 157.

Thus, where circumstantial evidence is relied upon to prove elements of the crime, as in the cause *sub judice,* the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. This determination of the reasonableness of a hypothesis as a jury prerogative was recognized by the Supreme Court of the United States in *Holland* v. *United States* (1954), 348 U. S. 121, wherein the court stated, at page 140:

"Circumstantial evidence in this respect is intrinsical-

ly no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. * * *''

Similarly, language in *State* v. *Sheppard, supra* (165 Ohio St. 293), likewise implies that the determination of reasonableness includes a determination of whether the hypothesis is reasonable in view of the weight and credibility that the jury gives to the evidence. (See *State* v. *Williams* [1976], 47 Ohio App. 2d 330, 336.) In paragraph six of the syllabus in *State* v. *Sheppard, supra,* this court stated:

''Where circumstantial evidence alone is relied upon in the proof of any element of a crime, and the jury finds that there is a reasonable hypothesis of innocence, after considering all the evidence, it is its duty to acquit; however, where the *jury finds,* after full deliberation, that there is *no reasonable hypothesis of innocence based on the facts as it finds them to be,* and the facts which it finds are irreconcilable with any reasonable hypothesis other than guilt, it is its duty to convict.'' (Emphasis added.)

Thus, once the jury has reached its decision, an appellate court, in a case where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence.

Determining, therefore, upon our review of the record, that it contains substantial evidence of probative value ''which, if believed, would convince the average mind of'' appellant's failure to work, his culpable state of mind and that officials in the Department of Industrial Relations, representing the state of Ohio, were operating under the false impression that appellant was working full time for the state ''beyond a reasonable doubt,'' we find no merit

to either of appellant's assertions that the trial court erred in denying his motion for acquittal or that the verdict is against the manifest weight of the evidence.

Accordingly, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'Neill, C. J., Herbert, P. Brown and Locher, JJ, concur.

Celebrezze, W. Brown and Sweeney, JJ., dissent.

Celebrezze, J., dissenting. Because the appellant was indicted under what purports to be the new larceny by trick statute, R .C. 2913.02, containing the previously absent words, "By deception," I find it difficult to concur in the opinion of the majority, and respectfully file my dissent.

The General Assembly recognized the difficulty of interpretation of the term "deception" and obviously attempted to remedy any misconception by defining it in R. C. 2913.01 as follows:

"(A) 'Deception' means knowingly deceiving another or causing another to be deceived, by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission which creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

I am unable to agree with the appellant's contention that since the victim "The State of Ohio * * * does not have a mind; it cannot conceive knowledge; and it of itself cannot be deceived. The deception, if any, must be practiced upon a natural person who represents the particular entity."

The uncontroverted evidence shows that the appellant received and cashed pay warrants from the state of Ohio under a job description category that he never once performed. Even the testimony concerning the "work"

that he did "perform" is contradictory. As I read the record appellant's employment by the state of Ohio appears to be a joint effort to obtain private service at public expense. Although this conduct is unquestionably unethical, it is difficult to fit such culpability under the terms of the new theft statute.

Under the prosecution's theory of the case, the appellant, by knowingly withholding information as to his daily activities, and by omissions which created false impressions in others, obtained state funds by a process of "deception." The record discloses that the job description, "Boiler inspector trainee," for which appellant was paid, listed such duties as checking existing boilers to see that they complied with safety codes, inspecting new installations, scheduling renewal inspections, making reports, attending training classes, etc. There is absolutely no testimony that the appellant ever performed any one of these duties or was even advised as a "boiler inspector trainee" what his duties were.

Depending on where one is reading in the record, appellant's "duties" involved helping his paraplegic father, enlarging photographs for the "Governor's Committee on the Handicapped," chauffering candidate Richard Celeste, and attending Cuyahoga Community College. Obviously, none of these is compensable by public monies.

The General Assembly, in revising the Ohio Criminal Code, used the American Law Institute's Model Penal Code (1962) for guidance and language. The following verbiage is particularly notable:

"Section 223.3. Theft by Deception.

"A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:

"(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise; or

"(2) prevents another from acquiring information which would affect his judgment of a transaction; or

"(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship; or

"(4) fails to disclose a known lien, adverse claim or other legal impediment to the enjoyment of property which he transfers or encumbers in consideration for the property obtained, whether such impediment is or is not valid, or is or is not a matter of official record."

It is easy to compare this quotation with that definition adopted by the General Assembly. Also pertinent is the comment from the Model Penal Code (Tent. Draft. No. 2, page 65 [1954]), as follows:

"2. *Purposely.*

"*Accidental or careless creation of a misimpression is not included. The actor must intend to create the impression for the purpose of inducing the owner to part with his property.* Even if he recognizes that the impression created is likely to have the effect of inducing consent, he is not guilty of deception unless that was his purpose. Likelihood of deception is, of course, evidence of a purpose to deceive; but *the ultimate issue is subjective purpose to deceive.* However, it is sufficient that inducing consent was one of several purposes of the actor." (Emphasis added.)

The record discloses no evidence as to appellant's purpose and intent to create an impression that he was performing any service for the state. Thus, in addition to the questionable "deception," there is a lack of proof of "purpose and intent." Of course this may be inferred from the circumstances surrounding the alleged act. But, there is no testimony in the record of any affirmative act of the appellant from which this conclusion might be drawn.

A full reading of the record demonstrates the design that led to the present situation.

The former Director of Industrial Relations testified as follows:

"My best recollection would be around April in the

spring of the year, 1974. Mr. Graven contacted me and suggested that he might hire his son, Michael Graven, as a trainee and the reason he asked me in this case was the fact that it was within the family. Ordinarily, I would not have even been approached and I answered him that if he had work for the man to do and if he had the money in his budget to pay—the answer would be—it would be all right."

In addition, there is the testimony of Mrs. Weiss:

"Q. [By Mr. Ellis] Mrs. Weiss, can you tell me what your occupation is?

"A. Yes, I work for the State of Ohio, secretary to the chief and the members of the Steam Engineers.

"Q. And prior to that, what was your—what did you do for the State of Ohio?

"A. I was a personal secretary to Mr. Graven.
"* * *

"Q. [By Mr. Ellis] Did you ever hear any discussion of Michael Graven's name?

"A. At the staff meetings, no, never.

"Q. During the period of April 1st, 1974—were you aware that he was placed on the payroll?

"A. I believe it was in April I was told that he was put on the payroll.

"Q. And following that time, until he was taken off, how many times did you see him in the office?

"A. During the period of that period of time?

"Q. Uh-huh.

"A. Two or—two times that I'm sure of, three possibly—about three times.

"Q. That you are sure of—I take it you remember something about it?

"A. Yes, he was in the office when Mr. Graven had a meeting with Mr. Celeste and he was in the meeting that day.

"Q. Who was he with that day?

"A. He was kind of in an outer office outside of my office—you know—kind of in the—

"Q. Did he come in with Mr. Celeste?

"A. He came in a short time after Mr. Celeste came in the office.

"Q. Did he leave with him?

"A. He left in the party with Mr. Celeste and the other gentlemen—they all left at the same time. * * *

"* * *

"Q. [By Mr. McDonnell] Now, no one else had access to the payroll records of your particular division, right?

"A. I saw them and Mr. Graven.

"Q. Right, and anyone else who saw them was in a higher position, is that right?

"A. Yes, sir, it would have to be in auditing or personnel, yes, sir.

"Q. So, Mr. Yost never did see those?

"A. I was not permitted to let anyone see them.

"Q. No one other than you and Robert Graven seen them?

"A. Without in our division that would have been it.

"Q. Now, could you say for a definite fact, Mrs. Weiss, that Michael Graven never drove his father on any business for the State of Ohio?

"A. To my knowledge, he never drove his father on any business in the State of Ohio."

Appellant's father testified:

"Q. [By Mr. Ellis] Mr. Graven, I understood your testimony to be that your son never worked as a boiler inspector trainee for the State of Ohio?

"A. That's correct.

"Q. Thereby, he never would have generated any kind of reports that would have been turned in to the Department?

"A. That's correct.

"Q. Would there be any other kinds of physical evidence of Michael Graven working for the State of Ohio?

"A. I don't see possibly how there could be, because I required no reports from him.

"* * *

"Q. Were you aware that Michael was driving for Richard Celeste?

"A. Yes, sir, I was.

"Q. Driving the automobile for Richard Celeste?

"A. Yes, sir, I was.

"Q. And you were aware that it was during the day, in the evening, over the night?

"A. Michael had asked me earlier in the program, before he was even put on any payroll if he could get involved in politics. I said there would not be anything wrong with it as long as I did not have a particular need for him on that day."

The testimony of Ms. Ann Bloomberg, who was the Cuyahoga County scheduler for Richard Celeste, reveals:

"THE WITNESS: He was—his availability seemed to be certainly adequate. He was a driver that I think I used probably proportionately more than other drivers.

"Q. [By Mr. Ellis] And can you tell me when you would contact him to drive?

"A. It would be anywhere from a week to one day prior to my need of a driver.

"Q. Did you experience any difficulty in contacting Michael Graven?

"A. Seldom.

"Q. Now, there have been some Celeste Campaign Schedules introduced here, and Mr. Graven's name appears as driver on quite a few of those. Did Michael Graven's name always appear when he drove?

"A. Not necessarily.

"Q. Would there be times when he would drive and his name would not be on this schedule?

"A. Yes. That is correct."

I have previously stated that the conduct of those involved herein was unethical. It is also immoral. However, it is not the function of this court to determine the morality of the state. Everyone, whether an official or a citizen, is subject, as a human being, to the same moral code. The involvement of any individual in any pursuit should not exempt him from the law which binds us all. The idea that public officials can absolve themselves of respon-

sibility to the moral code, or set up a legal code contrary to it, is one that this country rejected at the Nuremberg trials.

WILLIAM B. BROWN, J., dissenting. The main issue in the instant cause (although the majority treats it as an evidentiary question[1]) is what constitutes theft by deception under the new general theft provision. Because the effect of the majority opinion is to uphold the conviction of an accused for theft by deception when there is no evidence that the accused *deceived* anyone, I must dissent.

R. C. 2913.02 provides, in pertinent part:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either:

"* * *

"(3) By deception;"

Under the statute the state must prove: (1) that the accused knowingly obtained or exerted control over property or services; (2) that the accused did so with purpose to deprive the owner of the property or services of that property or those services; and (3) that the accused exerted or obtained such control by deception. Since the accused cashed the checks sent him by the state, he did knowingly exert control over that property. Therefore, in the instant cause the key element is deception. "Deception" is defined in R. C. 2913.01 in the following manner:

"(A) 'Deception' means *knowingly deceiving another* or causing another to be deceived, *by* any false or misleading representation, *by* withholding information, *by* preventing another from acquiring information, or *by any other conduct*, act, or *omission* which creates, confirms, *or perpetuates a false impression in another,* including a false impression as to law, value, state of mind, or other objective or subjective fact." (Emphasis added.)

---

[1] The majority characterizes the issue as whether the state "failed to establish various elements of the alleged crime, *i. e.*, that appellant deceived the state of Ohio, that the appellant practiced deception, and proof of appellant's culpable mental state."

The statutory definition of "deception" falls into two parts. The first sets forth the proscribed behavior (knowingly deceiving another).[2] The second lists the criminal "means or instrumentality"[3] by which such knowing deception may be carried out—"*by* * * * misleading representation, *by* withholding information, *by* preventing another from acquiring information, or *by* any other conduct * * * which creates, confirms, or perpetuates a false impression in another * * *." (Emphasis added.)

Therefore, under the combination of R. C. 2913.02(A)(3) and 2913.01(A), the state, in order to prove theft by deception, must establish: (1) that the accused knowingly obtained or exerted control over property or services; (2) that the accused obtained or exerted such control with purpose to deprive; (3) that the accused obtained or exerted such control by knowing deception; and (4) that such knowing deception was the result of misrepresentation or other conduct creating a false impression in another.

The fact that the theft by deception statutes require all four elements to be proved is clear from the language of the statutes themselves. Moreover, interpreting R. C. 2913.02(A)(3) and 2913.01(A) to require proof both of knowing deception and of the prohibited conduct causing that deception gives effect to every word in the statutes and insures that an individual cannot be found guilty of theft by deception on proof of less culpability than that required in the fraud provisions of R. C. Chapter 2913 which are designed to curb conduct similar to deception. This interpretation also places the Ohio theft by deception statute in line with similar provisions in other jurisdictions. (See Model Penal Code Section 223.3[3].)

On the facts of the instant cause, the majority is able to uphold the accused's conviction *only* by telescoping the third and fourth elements listed above. The only activity delineated in R. C. 2913.01(A) which the accused was

[2]A definition of "deceive" which appears in Webster's Third New International Dictionary is "to cause to believe the false."

[3]See the definition of "by" in Webster's, *supra* (No. 4a).

proved to have been engaged in was perpetuating a false impression by cashing his payroll checks. However, R. C. 2913.01(A) calls not only for proof of the types of conduct which might cause deception but also for proof of *knowing deception* itself. Since there was no evidence that the accused had anything to do with or knew of the deception practiced on the state when he was signed up on the payroll, and since there was evidence that he did state-related work for which he may well have thought he was being recompensed, the state did not prove beyond a reasonable doubt that, with awareness that his conduct would probably cause a certain result (R. C. 2901.22), the accused *caused* another to believe something false. In other words, the state failed, under R. C. 2913.02(A)(3) and 2913.01(A), to prove knowing deception beyond a reasonable doubt.

I, therefore, dissent.