[Cite as *State v. Southam*, 2018-Ohio-5288.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio

Appellee

v.

William I. Southam, Jr.

Appellant

Court of Appeals No. F-18-004

Trial Court No. 17CR87

**DECISION AND JUDGMENT**

Decided:  December 28, 2018

* * * * *

Scott A. Haselman, Fulton County Prosecuting Attorney, for appellee.

Charles M. Saunders, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Fulton County Court of Common Pleas which, following a jury trial, found appellant guilty of one count of breaking and entering and one count of failure to comply with order or signal of a police officer and

sentenced him to a total prison term of 24 months.  For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} On July 17, 2017, appellant William I. Southam, Jr. was indicted by a Fulton County Grand Jury on one count of breaking and entering, a violation of R.C. 2911.13(A), a felony of the fifth degree and on one count of failure to comply with order or signal of a police officer, a violation of R.C. 2921.331(B), a felony of the fourth degree.  Appellant allegedly stole electronics from Crossroads Evangelical Church in Wauseon, Fulton County, Ohio in the early hours of Sunday, June 18, 2017, and then immediately fled from the scene in his girlfriend's car to willfully elude the police in a high speed chase after being ordered to stop.

{¶ 3} After a period of discovery and pre-trial hearings, a two-day jury trial commenced on February 28, 2018.  At the conclusion of the prosecution's case, appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A), which the trial court denied.  Appellant renewed his motion for acquittal at the conclusion of his defense, which the trial court again denied.  At the conclusion of closing arguments the jury convicted appellant of one count of breaking and entering, a violation of R.C. 2911.13(A), a felony of the fifth degree and on one count of failure to comply with order or signal of a police officer, a violation of R.C. 2921.331(B), a felony of the fourth degree.  The verdict was journalized on March 5, 2018.

{¶ 4} Following appellant's conviction, on May 1, 2018, the trial court sentenced appellant to serve a 10-month prison term for the first count and a 14-month prison term

2.

for the second count with each prison term to run consecutively.  The sentencing judgment entry was journalized on May 3, 2018.

{¶ 5} It is from the trial court's May 3, 2018 journalized sentencing judgment entry which appellant timely filed his appeal setting forth four assignments of error:

I.  The trial court erred when it denied the appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

II.  Appellant's convictions are against the manifest weight of the evidence.

III.  The trial did not afford the appellant the right of allocution.

IV.  The appellant did not receive the effective assistance of counsel because counsel did not object to the imposition of mandatory fines and court costs, even though the Appellant was indigent and those fines and court costs should have been waived.  Sixth and Fourteenth Amendments to the United States Constitution; and Section 10, Article I of the Ohio Constitution.

## I.  Sufficiency of Evidence

{¶ 6} In support of his first assignment of error, appellant argued the trial court erred by twice denying his Crim.R. 29 motion for acquittal.  Appellant argued there was insufficient evidence with which to convict appellant of the indictments for breaking and

3.

entering and failure to comply with the police order or signal. First, appellant argued "there is no evidence that he ever went into any 'structure,' occupied or unoccupied." Second, he argued "no one saw with any clarity the driver of the car leaving the scene, or even who it was exiting the vehicle." Third, he argued "[t]here is not a single finger print of the [a]ppellant taken off any of the stolen electronics, the building broken into, or even the steering wheel of the car in which he was allegedly driving." Finally, he argued "despite [there] being a drop of the appellant's blood on the flashlight found outside the building in question, no [cuts] were observed on [a]ppellant's hand."

{¶ 7} In response, appellee argued there was sufficient evidence for each conviction of breaking and entering and failure to comply with order or signal of police officer, respectively. Appellee argued appellant "is not arguing that there is insufficient evidence from which the jury could conclude that every element of [the crimes] occurred, but instead [he] is arguing that there was insufficient evidence from which the jury could conclude that he was the person [who] committed each of those elements." Appellee then listed 27 pieces of circumstantial and direct evidence from the record from which the jury could convict appellant. Appellee argued that circumstantial evidence held the same probative value as direct evidence: "Put simply, State presented significant direct and circumstantial evidence, and there was sufficient evidence from which the jury could find, beyond a reasonable doubt, that each and every element of the aforementioned offenses had been committed by [a]ppellant (or that he was complicit in a third party's

4.

commission of those offenses as the jury was instructed on the issue of complicity (TR #2, pp. 192-93)).”

{¶ 8} We review a challenge to the sufficiency of evidence supporting a conviction at trial as follows: “the relevant inquiry is whether upon viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt.” *State v. Nicholson*, 6th Dist. Lucas No. L-17-1187, 2018-Ohio-4909, ¶ 12, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. All admissible evidence may be considered by the reviewing court on a claim of insufficient evidence. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80.

{¶ 9} In order for appellant to be found guilty of breaking and entering pursuant to R.C. 2911.13(A) appellee had to prove beyond a reasonable doubt that on or about June 18, 2017, appellant “by force, stealth, or deception” did “trespass in an unoccupied structure with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony.” Appellant acts purposely when “the gist of the offense is a prohibition against conduct of a certain nature, regardless of what [appellant] intends to accomplish thereby, it is [appellant’s] specific intention to engage in conduct of that nature.” R.C. 2901.22(A). A violation of R.C. 2911.13(A) is a felony of the fifth degree. R.C. 2911.13(C).

{¶ 10} In order for appellant to be found guilty of failing to comply with an order or signal of police officer pursuant to R.C. 2921.331(B) appellee had to prove beyond a

5.

reasonable doubt that on or about June 18, 2017, appellant "operate[d] a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring [his] motor vehicle to a stop." "Failure to comply, however, does not require proof of a willful or wanton disregard of the safety of persons or property; it merely requires proof that a person willfully elude or flee a police officer who has given a signal to stop." *State v. Fairbanks*, 117 Ohio St.3d 543, 2008-Ohio-1470, 885 N.E.2d 888, ¶ 9.

{¶ 11} A person acts willfully when the "act done intentionally, designedly, knowingly, or purposely, [is] without justifiable excuse." *State v. Earlenbaugh*, 18 Ohio St.3d 19, 21, 479 N.E.2d 846 (1985). "The Notes to R.C. 2901.22 explain the term 'purposely' means 'intentionally, 'willfully,' or 'deliberately.'" *State v. Powers*, 8th Dist. Cuyahoga No. 86365, 2006-Ohio-2458, ¶ 31, citing 1974 Advisory Committee Notes to R.C. 2901.22 ("'Purposely' in the new code equates with 'purposely,' 'intentionally,' 'willfully,' or 'deliberately' in the former law."); *State v. Kuhn*, 12th Dist. Warren No. CA2018-01-003, 2018-Ohio-4065, ¶ 14 ("Given the statutory definition of 'purposely' as provided in R.C. 2901.22(A), we find the same would hold true regarding Kuhn's claims that she could only be found guilty upon the state demonstrating she did so deliberately and/or willfully.") A violation of 2921.331(B) is a felony of the fourth degree where appellee proved beyond a reasonable doubt that, in committing the offense, [appellant] was fleeing immediately after the commission of a felony." R.C. 2921.331(C)(4).

6.

{¶ 12} Appellant's convictions may be proved by circumstantial evidence. *Jenks*, 61 Ohio St.3d at 283, 574 N.E.2d 492 ("Circumstantial evidence is no more and no less probative than direct evidence."). Appellate courts will not reverse a jury decision where circumstantial evidence is relied upon unless "the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence." *State v. Lott*, 51 Ohio St.3d 160, 167-168, 555 N.E.2d 293 (1990), quoting *State v. Graven*, 54 Ohio St.2d 114, 119, 374 N.E.2d 1370 (1978). "While inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings." *Id.* at 168, citing *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 332, 130 N.E.2d 820 (1955).

{¶ 13} At the conclusion of appellee's case, appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A). The transcript of the proceeding is in the record, and the extent of appellant's first acquittal motion and the trial court's decision was the following:

> Ms. Kruse: We would make a Motion under Rule 29, moving for a judgment of acquittal on the ground that the Prosecution failed to present sufficient proof from which any rational juror could conclude beyond a reasonable doubt that my client, William Southam, Jr., is guilty on each and every count.

> Court: Well, I'm certainly not going to comment on the issue of whether or not the State has proven their case beyond a reasonable doubt,

7.

that's clearly the responsibility for the jury. But it appears to me that the State has established a prima facie case on which the jury could conclude that your client committed these offenses. So I'm going to overrule that objection.

{¶ 14} Appellant's acquittal motion was made pursuant to Crim.R. 29(A), which states, in part:

> The court on motion of a defendant * * *, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * *, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

Appellant's motion under Crim.R. 29(A) is governed by the same standard as a challenge to the sufficiency of evidence supporting a conviction at trial. *State v. Beavogui*, 6th Dist. Wood No. WD-17-009, 2018-Ohio-2432, ¶ 42.

{¶ 15} The record shows that at the point of appellant's first acquittal motion, appellee had submitted eight witnesses to direct and cross-examination, and the trial court admitted 59 exhibits without appellant's objections. Appellee's witnesses at trial included six people from law enforcement and two people associated with the victim church. Through the evidence in the record, the details of the investigation for the crimes at issue were presented.

8.

{¶ 16} Wauseon police officer Brad Croninger testified at trial he was on patrol duty before 4:00 a.m. on June 18, 2017, when he heard the dispatch of an alarm call for a possible break-in at the Crossroads Evangelical Church. He was so close to the church, he responded within 30 seconds of the dispatch and observed an idling, dark colored sedan car parked in the middle of the deserted and unlit church parking lot facing away from the driveway he entered. As he approached, the driver took off to exit the other driveway. Croninger activated his overhead lights to get the car to stop. Activating the overhead lights simultaneously activated the dash cam video, which was also admitted into evidence. The driver did not stop and proceeded to go through a stop sign intersection. Croninger then also activated his police siren, and the driver still did not stop. There was no other traffic. Croninger did not lose sight of the driver during the pursuit.

{¶ 17} Wauseon police officer Joseph Bandeen testified he also was on duty when he heard the dispatch. He activated his overhead lights and arrived from the opposite direction of Croninger. Bandeen saw in the distance Croninger's car pursue the driver. Bandeen angled his car so as to create a road block for the oncoming driver. The driver did not stop and swerved onto the grass of private property to get around Bandeen and continue to head south out of Wauseon. Croninger continued to pursue the driver, and Bandeen turned around to trail Croninger.

{¶ 18} From there a high-speed chase of the driver ensued with the driver ignoring all stop signs and stop lights. Croninger testified, "My vehicle was going 100 miles per

9.

hour, and I was not closing that gap enough to even be able to read that license plate or get a better make of the vehicle."

{¶ 19} Eventually the driver entered the West Elm Apartment complex in Wauseon. Croninger testified he lost sight of the driver for "approximately maybe two seconds as the buildings were in our way. But as I rounded that corner to that straight shot where he ended up stopping, I could still see the vehicle pulling up to a stop. And at that point [about 200 feet away], I see a subject bail out of the driver's side." Croninger identified appellant as the person who fit the description of the person fleeing from the car.

{¶ 20} Bandeen then found Croninger and after an initial search outside with flashlights, they split up. Bandeen stayed by the building while Croninger returned to his police car to run the abandoned car's license plate for owner registration information. Croninger testified he approached the abandoned car and easily saw through the open windows with his flashlight in the backseat "a stack of tablets, Kindles and other random items back there." Croninger quickly learned the car owner was Wendy Zimmerman, whose address number was apartment 1106 on the second floor of the building before them. Croninger also requested a K-9 unit "to come to the scene to track from the car to wherever that subject might have went." The police officers maintained radio contact with each other. By 4:20 a.m. they knocked on Ms. Zimmerman's door. She answered the door within ten seconds of the knock and was very alert at that hour.

10.

{¶ 21} Zimmerman closed her door and came out into the hallway. After the police advised her "that her vehicle was involved in a breaking and entering, that the subject had pulled in next to the building and run behind the building and that we had lost sight of him," they asked if anyone was with her or was using her car. She insisted only her children were and no one should have been using her vehicle that morning. She refused repeated requests by the police to enter her apartment to look around.

{¶ 22} Bandeen remained in the hallway with Zimmerman while Croninger returned outside to wait for the K-9 unit. Bandeen heard footsteps pacing in front of the doorway and eventually heard a man's voice talking on a phone. Bandeen testified, "Then when I heard the man's voice on the cell phone, she admitted that her boyfriend was in the apartment. At that point, I told her that she needed to have her boyfriend come out onto the landing. And then I notified Officer Croninger over the radio." Zimmerman's boyfriend is appellant. Croninger then returned to the apartment because the K-9 unit still had not arrived, and both police officers saw appellant come out of the apartment in his underwear and sweating. They noted Zimmerman was not sweating. The K-9 unit then arrived. Bandeen remained in the hallway while Croninger returned outside.

{¶ 23} Deputy Henry County Sheriff Ross Saneholtz was the K-9 officer who responded to a dispatch call on June 18, 2017, to assist the Wauseon police. Saneholtz testified he arrived at the apartment building at 4:40 a.m. The K-9 dog traced the driver's scent from the car to the apartment building's back door. "The closer we got to that west

edge [to the back entrance], the more his head went down. And when we actually made the corner, his head was down up until we get to the back door. * * * [H]is change in behavior was right around that door. I would interpret that as the person went in the door." Croninger verified the K-9 dog was not tracking the police's scent. "And that's where we were able to determine that that south edge [outside the apartment building], we were never in, but that dog tracked through that south edge."

{¶ 24} Both appellant and Zimmerman then agreed to be interviewed at the police station. Croninger transported them uncuffed and unrestrained to the Wauseon police station. He placed them in an interview room where he read them their Miranda rights. "I advised them that at that time, that they were not under arrest. They agreed to speak with the detective. He was on his way." Initially Zimmerman and appellant waited in the interview room together, where recording equipment was always on, but later were separated.

{¶ 25} Kevin Chittenden was the Wauseon police detective who interviewed the witnesses on June 18, 2017. Chittenden testified he received a call between 4:30 to 5:00 a.m. to assist with the investigation. He first went to the apartment complex. "I went out there, made sure that the vehicle was being towed and secured properly for us to possibly do a search warrant later." He met Bandeen who was waiting for the tow truck. "He was standing by with the vehicle. And shortly after, the tow truck driver was there as well. * * * I did shine my light into the back windows and looked in, yes. * * * There were tablets that were laying, * * * on the back seat and also on the back seat floorboard."

12.

**{¶ 26}** Chittenden then went to the police station and met with Croninger for updates. Chittenden decided to interview appellant first. They spoke for about 30 minutes. Chittenden testified at trial:

He was a little bit loud, not uncooperative but not really answered too many questions. When I told him that I didn't believe him, he then stopped the interview. * * * [Before that] He said that he was at home. He was sleeping. That Wendy had woke[n] him up. He didn't know anything [of] what was going on. He said that – the patrolman must have gave [sic] him some of the details about why he was up there. So he said that Wendy leaves her keys in the car quite often and he does not know who took it or any of that involvement. * * * [After re-watching the video for the period even before he arrived at the department] I did notice at one point when he was speaking with Wendy in the interview room, he kind of had [potential cuts on his hand], possibly wiping it on his leg. And also at one point, he kind of brought his hand up to his mouth, like maybe he licked off something or had licked his finger. But nothing that we could definitely say was a cut.

**{¶ 27}** Chittenden testified he then interviewed Zimmerman for about 30 minutes. "She was a little bit more standoffish, but nothing extraordinary or out of the normal." The video recordings of each interview, with certain agreed-upon redactions, were each admitted into evidence at trial.

13.

**{¶ 28}** The record did not contain any direct evidence of appellant at the church on June 18, 2017, but it contained testimony of the investigation conducted at the church.

**{¶ 29}** Cliff Macklin, a church volunteer, testified that June 18, 2017, was a Sunday, so he arrived early, as usual, to do some maintenance and prepare classrooms for Sunday School. Macklin testified he "[h]eard word of some break-in of some sort. Don't know the extent of it. After I was done with my duties or attending service, I went out – I was told where to go look as in where it might have been and to inspect what was damaged or not, and then I proceeded from there." Macklin walked outside and saw the broken window. He found near the broken window shattered glass on both sides of the window along with a flashlight and two five-dollar bills. "Well, I noticed that there was apparently something on the flashlight, and I decided to get a tissue to gather it that way and then proceed to maybe find someone to maybe give it to, a pastor, and then it was bagged. * * * It looked like to be blood." The flashlight was admitted into evidence.

**{¶ 30}** William McConnell, Wauseon's assistant police chief on June 18, 2017, testified he received a call about the church break-in at 4:45 a.m. He lived nearby, so he arrived at the church by 5:00 a.m. and began documenting the scene with a camera and collecting evidence. The photos and evidence collected were admitted into evidence. McConnell observed the glass on the door to the main church office was broken and the door was halfway open. He then observed the door to an assistant pastor's office had "scratch marks or pry marks around the door area" although the door glass was not broken. Because the rest of the church campus had not yet been checked, the police

14.

officers at the scene decided to conduct a methodical search counterclockwise through the sprawling building. This was now around 6:00 a.m. Their search discovered a shattered glass window and the broken screen to that window as the point of entry for the thief. The assistant pastor's office was missing a number of electronics items and approximately $100 cash.

{¶ 31} Kevin Clark, an associate pastor at the church, testified the church has an unmistakable, audible alarm triggered by motion detectors. On June 18, 2017, Clark received a call around 5:00 a.m. from another assistant pastor about the alarm triggered at the church. Clark testified "electronics" were used throughout the church based on activities and church operations.

We have tablets for our children and for visitors to kind of keep their kids engaged. So some of those items were in Tyler Quillet's office at the time that [sic] came up missing * * * that morning. * * * When I got there, I had noticed that the main office, the window had been broken in, and it had shattered everywhere, was inside the room there and noticed * * * [at] Tyler Quillet's office * * * you could see there were marks where, like, a crowbar or pry bar was used to try to get into a couple of doors there. And then some of the other doors to the facilities or to the offices that kind of go around by Tyler's office had been opened. You could see that there were some drawers that had been opened and pillaged through.

15.

A few days later, Clark met with Chittenden at the police station to identify the evidence recovered from the search warrant on Zimmerman's vehicle. He was able to identify all the electronic devices, including two that were marked for children with specific "Crossroads Café" software content on them.

{¶ 32} Chittenden testified that following his interviews with Zimmerman and appellant he wrote his report and prepared a search warrant for Zimmerman's vehicle for the next business day on Monday. As a result of the search warrant, more evidence was collected, which was admitted into evidence.

{¶ 33} Chittenden further testified he submitted two items to the Ohio Bureau of Criminal Investigation (BCI) on June 21, 2017, for DNA testing: (1) a gray flashlight with possible dried blood on it "halfway on the handle and a little bit up here by the light bar"; and (2) a drywall knife brought to the police department on June 19, 2017, by an assistant pastor at the church. "It was located on a desk inside of the church office. Once the church staff got there and was [sic] able to go through everything, they had noticed the knife and said that's not normally there. That's nothing that belonged to the church."

{¶ 34} After Chittenden "received back what was called a hit confirmation," he then obtained a search warrant for appellant's buccal swabs so BCI could "compare it to the DNA from the * * * blood splat that was on the flashlight." Chittenden testified he obtained the buccal swabs from appellant at the apartment on October 30, 2017. "Said he knew we were coming and submitted to it."

16.

**{¶ 35}** Amy Wanken, a BCI forensic scientist, testified she tested the flashlight, drywall knife, and appellant's buccal swabs. As a result of her tests, Wanken did not find enough DNA from the knife to be "suitable for comparison." However, the substance found on the flashlight was blood and matched appellant's DNA. "Upon comparison between the known standard and the sample from the flashlight, I was able to conclude that William Southam, Junior was included as a potential contributor, and the statistic that I was able to calculate for that was rarer than one in one trillion."

**{¶ 36}** Following the trial court's denial of his first motion for acquittal, appellant proceeded with his defense with testimony by Zimmerman and admitting her apartment lease into evidence.

**{¶ 37}** Zimmerman testified appellant had been her live-in boyfriend for the entire time she lived at the West Elm Apartments, starting in 2015. He was not listed on the lease because she feared the rent would increase beyond what she could afford and face the possibility of eviction and losing custody of her two children to their father.

**{¶ 38}** Zimmerman further testified that "several times" she parked at her apartment complex and forgot her keys in the ignition of her car or on top, as well as her wallet and cell phone on top of her car and her house keys in the door to her apartment. It is also "not unusual" she forgets to lock her car. Appellant always leaves his state identification card in the car, along with many of his belongings, including a gray flashlight.

17.

Q:  You mentioned the gray flashlight.  Is this in Exhibit Number 20?  Does this appear to be that flashlight?

A:  Yes.

Q:  Okay.  And that was in the trunk?

A:  Yes.

{¶ 39} She further testified the temperature in the apartment on June 18, 2017, was, "Really warm.  I can't say warm.  It was really, really hot.  I mean you just walk around sweating."  Despite the heat, she testified she and appellant went to bed the evening of June 17, 2017, with the sole bedroom window closed and no air conditioning.  To her knowledge, appellant remained asleep beside her all night.  When the police knocked on her door early on June 18, 2017, she was already up to use the restroom, so she was able to respond quickly because she was just coming out of the bathroom.

Q:  Where was William when you left the bedroom to use the bathroom?

A: I n bed.  I had to climb over William.

Q:  What was William doing when you left the bedroom to use the bathroom?

A:  Sleeping.

Q:  Where was William when the police knocked on your apartment door?

A:  Still sleeping.

{¶ 40} Zimmerman further testified that both she and appellant did not work since 2015.  Her income was child support, while his income was support from his mother and stepfather.  She admitted she told Chittenden at the police station interview she frequently forgets "a lot of stuff because I take pills for bipolar, depression, and anxiety, and that factors into my forgetfulness.  I sleep a lot.  I take a lot of pills."

{¶ 41} Zimmerman denied driving to the Crossroads Evangelical Church on June 18, 2017, and getting into a high speed chase with Wauseon police.

{¶ 42} Appellant rested his defense and renewed his motion for acquittal.  According to the transcript in the record the following discussion was held for the second motion.

> Court:  Let's indicate we're back in chambers in the Southam case.  Counsel is present along with Mr. Southam.  I believe Counsel you have a Motion you would like to make at this time?

> Ms. Kruse:  Yes.  I'd like to renew the – our Rule 29 Motion for Acquittal.  The State has not proven beyond a reasonable doubt all of the elements of the charges.

> Court:  And the Court is going to overrule the objection for the same reasons stated when we made our break earlier today.

{¶ 43} We reviewed the record in this case.  We find that after reviewing all the admissible evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crimes by

appellant of breaking and entering and failing to comply with order or signal of police officer.

{¶ 44} Appellant's first assignment of error is not well-taken.

## II. Manifest Weight of the Evidence

{¶ 45} In support of his second assignment of error, appellant argued his convictions are against the manifest weight of the evidence because "the jury clearly lost its way." Appellant argued the jury lost its way for a number of reasons. First, "the State joined two separate crimes to the prejudice of Mr. Southam." Second, all of the State's witnesses "failed to identify Mr. Southam." Third, the State "failed to collect any specific evidence at all to tie him to the crimes at issue beyond a stolen vehicle and flashlight. This was not circumstantial evidence, but rather inference upon inference."

{¶ 46} In response, appellee argued the jury did not lose its way. Appellee argued "much of the evidence [the State] procured at trial is direct evidence" and that appellant's "bald assertion that there was 'inference(s) upon inference(s)' is simply without merit."

{¶ 47} A challenge to a jury conviction based on the manifest weight of the evidence questions whether the jury could find a greater amount of credible evidence was admitted at trial to sustain that decision than not. *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 75, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must "extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and

20.

discerning qualities such as hesitancy, equivocation, and candor." *Beavogui*, 6th Dist. Wood No. WD-17-009, 2018-Ohio-2432, at ¶ 55. This court has repeatedly stated that in determining whether a verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way to create such a manifest miscarriage of justice as to require a new trial. *State v. Reynolds*, 6th Dist. Lucas No. L-16-1021, 2017-Ohio-1478, ¶ 47. A conviction will be overturned only in exceptional cases. *Id.*

{¶ 48} We reviewed the entire record with respect to the crimes of breaking and entering and failing to comply with order or signal of police officer and find there was clearly enough credible evidence admitted at trial for the jury to reach its decisions. Despite appellant's assertions to the contrary, we do not find the jury clearly lost its way to create such a manifest miscarriage of justice as to require a new trial.

{¶ 49} Appellant's second assignment of error is not well-taken.

### III.  Allocution

{¶ 50} In support of his third assignment of error, appellant argued the trial court erred and the matter should be remanded for resentencing because his sentence was determined before permitting him to speak. Appellant argued the trial court only spoke to his attorney during the sentencing hearing. Appellant further argued that "if a person maintains their innocence during an entire proceeding, and is still found guilty, due

21.

process demands the court ask the defendant where he feels the system failed him * * * curiosity alone should have been enough of a motivation to make this inquiry."

{¶ 51} In response, appellee argued the trial court did not err. Appellee argued the trial court clearly and unambiguously invited appellant to speak during the sentencing hearing, and appellant declined to speak. If the trial court erred, appellee argued appellant or his counsel invited the error.

{¶ 52} This court has determined Crim.R. 32(A)(1) requires the trial court to directly, personally, and clearly ask the defendant if he wishes to exercise his right of allocution. *State v. Reese*, 6th Dist. Lucas No. L-17-1132, 2018-Ohio-2981, ¶ 37. Crim.R. 32(A)(1) states, "Imposition of sentence. * * * At the time of sentence, the court shall * * * (1) Afford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." The allocution requirement is fulfilled when it is clear from the circumstances the court indicated to the defendant his right to make a statement prior to imposition of the sentence. *Reese* at ¶ 37, citing *State v. Harvey*, 3d Dist. Allen No. 1-09-48, 2010-Ohio-1627, ¶ 15. However, resentencing will not be required if the trial court's error was invited error or harmless error. *State v. Campbell*, 90 Ohio St.3d 320, 326, 738 N.E.2d 1178 (2000).

{¶ 53} The record contains appellant's sentencing hearing transcript from May 1, 2018. The trial court clearly and unambiguously provided appellant his right of allocution on two separate occurrences prior to sentencing.

Court:  This is case number 17CR87, State of Ohio versus William Southam.  Mr. Southam is present today with his counsel, Ms. Krause.  * * * The Court requested that a presentence investigation be completed.  The Court was hoping that the Defendant would cooperate with that.  The Defendant declined.  As a result, the Court is left with some discretion in this matter, I guess.  However, the Defendant does have rights pursuant to Criminal Rule 32 to make a statement in mitigation or present any evidence.  Anything you'd like to say at this time, Ms. Kruse?

Ms. Kruse:  Your Honor, my client has indicated to me that he would – although convicted back in late February, early March, that he would like to maintain his innocence, and that was one of the reasonings [sic] of not completing the PASI, Your Honor.  He would request at the time, he was not employed because he was seeking Social Security disability for being hit by a train in 2015.

{¶ 54} After appellant's attorney addressed the trial court with various mitigating factors, the court then asked, "Anything from the State?"  After the prosecution addressed the trial court, the court then turned to appellant, "Anything else you'd like to say?"  The transcript is silent as to any appellant gestures, but it is clear he did not speak on the record.  The trial court was clearly addressing appellant, then appellee, and finally appellant again.  According to the transcript, his attorney responded to the trial court

23.

with, "We understand that my client has a lengthy criminal history, Your Honor. But again, he is at the mercy of the Court and maintains his innocence at this time."

{¶ 55} Before announcing the sentencing determinations, the trial court noted it "has little guidance in this case because of [sic] there is no presentence investigation other than the Defendant's past criminal record." Even if the trial court's words "Anything you'd like to say?" and "Anything else you'd like to say?" did not specifically parrot the language of Crim.R. 32(A) for a "statement * * * in mitigation of punishment," the exact language was not required in order for the court's invitation to comply with Crim.R. 32(A). *State v. Belew*, 6th Dist. Lucas No. L-11-1279, 2013-Ohio-1078, ¶ 30.

{¶ 56} In its sentencing judgment entry journalized on May 3, 2018, the trial court confirmed appellant was present on May 1, 2018, in open court with his attorney, and prior to determining his sentence, the trial court considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under R.C. 2929.11 and balanced the seriousness and recidivism factors under R.C. 2929.12.

{¶ 57} We reviewed the record for appellant's sentencing hearing and find the trial court fulfilled its duty under Crim.R. 32(A)(1).

{¶ 58} Appellant's third assignment of error is not well-taken.

### IV. Ineffective Assistance of Counsel

{¶ 59} In support of his fourth assignment of error, appellant argued his trial counsel was ineffective because she "did not argue that he was indigent and lacked the

present and future ability to pay fines and court costs," resulting in actual prejudice because $4,122.83 "in fines and court costs [were] imposed as part of his sentence." Appellant argued that "[e]ffective counsel could have noted on the record that [appellant] was indigent."

{¶ 60} In response, appellee argued the trial court did not err. Appellee argued the trial court only imposed costs of $4,122.83, which did not include any discretionary fines or costs. Appellee further argued "the decision of whether to seek a waiver of the costs described in R.C. 2947.23(A)(1)(a) at the time of sentencing, or at a later date, is a matter of strategy that cannot be reviewed on appeal." Appellee conceded that to the extent the trial court imposed costs for appointed counsel, the trial court was required to first inquire as to appellant's ability to pay.

{¶ 61} An ineffective assistance of counsel claim must overcome the strong presumption that a properly licensed Ohio lawyer is competent. *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 95. The record does not show appellant questioned the licensure of his trial counsel, so her competence was presumed.

{¶ 62} To overcome this presumption of competence, appellant had the burden in an ineffective assistance of counsel claim to show both deficient performance by his trial counsel below an objective standard of reasonable representation and a reasonable probability of prejudice that but for his trial counsel's errors, the court costs and costs of appointed counsel would not have been imposed. *Id.*

25.

{¶ 63} The record contains appellant's sentencing hearing transcript from May 1, 2018. During the statements of mitigation, appellant's attorney stated, "He would request at the time, he was not employed because he was seeking Social Security disability for being hit by a train in 2015." The reference to the lack of gainful employment was an attempt to explain why appellant did not cooperate with the presentencing investigation. While it is unclear how appellant's lack of gainful employment impeded the PSI process, it is also clearly part of the sentencing record that appellant's counsel brought to the court's attention appellant's lack of employment.

{¶ 64} The trial court then mentioned costs immediately following the trial court's decision of appellant's prison terms.

Court: Defendant will be ordered to pay the cost of prosecution and a fine will be imposed. * * * Anything further from counsel in this matter?

Mr. Kennedy: No, sir.

Ms. Kruse: Your honor, just briefly. There was a $2,500 bond posted in this case, and we would ask that that be released.

Court: The bond will be discharged.

{¶ 65} It is part of the sentencing record that appellant's counsel brought to the court's attention the necessity to release appellant from the financial obligation of the $2,500 bond. According to the record, the $2,500 cash bond journalized on July 6, 2017, was a "deposit" that the court subsequently refunded to Angela Southam as journalized on May 4, 2018.

26.

**{¶ 66}** In its sentencing judgment entry journalized on May 3, 2018, the trial court stated, "Defendant is ordered to pay all prosecution costs, court-appointed counsel costs, and any fees permitted pursuant to O.R.C. §2929.18(A)(4)."

**{¶ 67}** We will first address the prosecution costs. We review a challenge to the imposition of court costs or the costs of prosecution in the context of an ineffective assistance of counsel claim as follows:

> The trial court is required to impose court costs pursuant to R.C.
> 2947.23 whether or not the defendant is indigent. A defendant may move
> at the time of sentencing to waive payment of court costs. R.C. 2947.23(C),
> effective March 22, 2013, provides that the trial court retains jurisdiction to
> address the waiver, suspension, or modification of the payment of costs
> after sentencing. Therefore, the decision of when to file the motion to
> waive the payment of costs can be a matter of trial strategy.

*State v. Pultz*, 6th Dist. Wood No. WD-14-083, 2016-Ohio-329, ¶ 61. Our review of the record shows that on June 27, 2018, the trial court issued a "Costs Due Notice" to appellant for a total of $4,122.83. The notice does not itemize the costs nor provide any detail other than reflect it is for the case at issue and acknowledged the "last payment" was made on July 6, 2017, which is presumably the cash bond deposit by Angela Southam and subsequently refunded. The day after the "Costs Due Notice," appellant filed in the record an affidavit of indigency.

27.

{¶ 68} "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Upon review of the record we do not find appellant's trial counsel was ineffective at the time of sentencing with respect to appellant's claims of indigency to the extent the $4,122.83 in costs imposed were for the costs of prosecution.

{¶ 69} We will next address the court-appointed counsel costs. "Unlike the costs of prosecution, the imposition of the costs of * * * appointed counsel are premised on a finding of a defendant's present or future ability to pay. Such a finding need not be made at a formal hearing, but the record must contain some evidence that the court considered the defendant's ability to pay." (Citations omitted.) *State v. Seals*, 6th Dist. Lucas No. L-17-1177, 2018-Ohio-2028, ¶ 14. R.C. 2941.51(D) states, in part:

> The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.

{¶ 70} Upon review of the record we do not find appellant's trial counsel was ineffective at the time of sentencing with respect to appellant's claims of court-appointed counsel costs to the extent the $4,122.83 in costs imposed were for court-appointed counsel costs. The record contains some evidence of appellant's trial counsel bringing to

the court's attention the lack of appellant's gainful employment and the need to release the cash "deposit" on file with the clerk of courts. Although we would prefer the trial court expressly state in its final judgment that it considered appellant's present and future ability to pay the costs of court-appointed counsel, the record does not clearly lead us to conclude that the absence of such express language is due to the ineffectiveness of appellant's trial counsel. Appellant failed to raise any other grounds for review of the trial court's determination of court-appointed counsel costs. App.R. 12(A)(2).

{¶ 71} We reach the same conclusions when addressing the trial court's judgment entry regarding fees permitted pursuant to R.C. 2929.18(A)(4). To the extent the $4,122.83 in costs imposed were fees permitted under R.C. 2929.18(A)(4), we would prefer the trial court expressly state in its final judgment that it considered appellant's present and future ability to pay the amount of the sanction or fine. R.C. 2929.19(B)(5). Nevertheless, the record does not clearly lead us to conclude that the absence of such express language is due to the ineffectiveness of appellant's trial counsel. Appellant failed to raise any other grounds for review of the trial court's determination of court-appointed counsel costs. App.R. 12(A)(2).

{¶ 72} Appellant's fourth assignment of error is not well-taken.

{¶ 73} On consideration whereof, we find that substantial justice has been done in this matter. The judgment of the Fulton County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

29.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                    _____
                                                              JUDGE

Thomas J. Osowik, J.

                                            _____
James D. Jensen, J.                                           JUDGE
CONCUR.

                                            _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.